764 P.2d 759

The CHURCH OF JESUS CHRIST OF LATTER–DAY SAINTS, a Utah corporation sole, Petitioner,

v.

SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF MARICOPA, the Honorable Cheryl K. Hendrix, a Judge thereof, Respondent Judge,

Cynthia BROWN, as Guardian for Adriene Leigh Brown; Willa Ray; Kenneth Ray, Real Parties in Interest.

No. 1 CA–SA 267.

Court of Appeals of Arizona, Division 1, Department B.

July 21, 1988.

Review Denied Dec. 20, 1988.

Vermeire & Turley, P.C. by Kent E. Turley, Phoenix, for defendant/petitioner.

Steven M. Friedman, P.C. by Steven M. Friedman, Phoenix, for plaintiff/respondent.

Lewis & Roca by Douglas L. Irish, and Janet Napolitano, Phoenix, for amicus curiae, Diocese of Arizona (The Episcopal Church).

Guy M. Buckley, Mesa, for real party in interest Willa Ray.

---

**OPINION**

FIDEL, Judge.

In this special action, The Church of Jesus Christ of Latter–Day Saints invokes the clergyman/penitent privilege on behalf of three of its officers, asserting that, as lay priests of the church, they are privileged to resist certain discovery orders of the superior court. The Church also asserts that defendant Kenneth Ray, a former member now excommunicated, is privileged as a penitent to resist the court's discovery orders.

Underlying this proceeding is a personal injury action arising from the sexual molestation of a young girl. Cynthia Brown, the child's mother, brings this suit on her daughter's behalf against Kenneth Ray, the alleged molester, Willa Ray, his former wife, and the Church. Brown seeks to discover information to support her claim that the Church negligently exposed children such as her daughter to Ray's abuse when it earlier undertook to counsel and treat Ray as a child molester, did so carelessly, and violated its affirmative duty to report Ray's conduct to appropriate authorities of the state.[1]

Three officers of the Church—George Standage, Art Bailey, and Earl Taylor—were ordered by the trial court to submit to depositions by plaintiff's counsel and to disclose certain conversations with and about Ray at a time preceding his contact with the Brown child. Ray was likewise ordered to submit to deposition about his contact and communications with these officers. Although the trial court accepted the Church's claim that these communications were privileged in part, it rejected the claim that they were entirely privileged. From the trial court's order that the depositions proceed along certain lines of permissible questioning, the Church seeks special action review.

### *Jurisdiction*

■ When a trial court orders disclosures that a party or witness believes to be

---

1. The Church has filed a motion for summary judgment in the trial court. The parties have agreed to defer resolution of that motion pending resolution of the present discovery issue.

protected by a privilege, appeal provides no remedy. Special action is the proper means to seek relief. For that reason, and because this petition presents issues of statewide importance, we accept review.

*Facts*

The facts, as best we can discern them from the record on special action, are these: On March 20, 1984, Cynthia Brown, the plaintiff, went to pick up her three and a half year old daughter at the home of Kenneth and Willa Ray; the Rays had been babysitting her child regularly since 1982. Willa Ray informed Mrs. Brown that afternoon that Kenneth Ray had a sexual problem and had molested his own daughters. Mrs. Brown, who had been troubled by her daughter's abnormal interest in sexual behavior over the past year, suspected that her daughter had become Ray's victim. On the following day, Mrs. Brown reported her concern to the Mesa Police Department, which had already begun to investigate other reports of molestations by Ray.

Two weeks earlier, on March 9, 1984, Allen Farnsworth, Ray's stake president, a local officer in the LDS Church, had been informed of an unrelated molestation by Ray. Farnsworth asked Ray's ward bishop, Harold Stradling, to confront Ray with the allegation; when Stradling did so, Ray admitted it and acknowledged similar acts with other young girls. On March 13, 1984, the Church excommunicated Ray for conduct unbecoming a member. The following day, pursuant to A.R.S. § 13-3620(A),[2] Farnsworth reported Ray's

actions to the Child Protective Services Agency of the Arizona Department of Economic Security.

Ray was subsequently investigated, prosecuted, and, upon his entry of a no contest plea, convicted for various counts of molestation including the molestation of the plaintiff's child. Portions of the Mesa Police Department's investigative report on Ray have been provided for our review. According to that report Ray admitted to the police that he had molested the Brown child at least twice when she was two years old, and he admitted molesting numerous other children over a period of more than twenty years. Ray discussed with the police a document that he had prepared for Farnsworth and Stradling and that an officer of LDS Social Services had provided to the police. On it, Ray had listed thirty-three of his victims. He also volunteered the names of Standage, Bailey, and Taylor to the police as church officials with whom he had earlier discussed "his problem." We quote that portion of the police report concerning Standage, Bailey, and Taylor:

At this point I asked Mr. Ray how many times he had had contact with church authorities in reference to his sexual problem. Mr. Ray told me that in 1968 he had had contact with a Bishop George Standage reference sexual contact with a twelve (12) year old named Debbie and his daughter.... Mr. Ray stated that this Bishop Standage sent him to see a Franklin Gibson for counseling. Mr. Ray further stated that he had seen a Bishop

**2.** Arizona's child abuse reporting statute, A.R.S. § 13-3620(A) provides:

Any physician, hospital intern or resident, surgeon, dentist, osteopath, chiropractor, podiatrist, county medical examiner, nurse, psychologist, school personnel, social worker, peace officer, parent or counselor or *any other person* having responsibility for the care or treatment of children whose observation or examination of any minor discloses reasonable grounds to believe that a minor is or has been the victim of injury, sexual molestation, death, abuse or physical neglect which appears to have been inflicted upon such minor by other than accidental means or which is not explained by the available medical history as being accidental in nature ... shall immediately report or cause reports to be made of

such information to a peace officer or to the protective services of the department of economic security. Such reports shall be made forthwith by telephone or in person forthwith and shall be followed by a written report within *seventy-two hours.* Such reports shall contain:

1. The names and addresses of the minor and his parents or person or persons having custody of such minor, if known.

2. The minor's age and the nature and extent of his injuries or physical neglect, including any evidence of previous injuries or physical neglect.

3. Any other information that such person believes might be helpful in establishing the cause of the injury or physical neglect. (Emphasis added.)

Art Bailey while he was in Albuquerque, New Mexico, during the period of May 1976 to May 1980 and that he had told this Bishop Bailey about dating an adult female and also about his contact with the twelve (12) year old Debbie, last name unknown, and his daughter ..., but he did not go into specifics. Mr. Ray states that he cannot recall the outcome of that encounter. Mr. Ray further states that he had contact with a Bishop Taylor who was a Stake President during 1976, that this Bishop Earl Taylor called him from Mesa while he was in Albuquerque and advised him that Anita Jo and Roseann ... had come forward about the incident in which they were molested while they were seven (7) and eight (8) years of age. Mr. Ray stated that he was advised at that time to have regular contact with his local Bishop but that he disregarded that church mandate.

Plaintiff's counsel now wishes to depose Ray, Standage, Bailey, and Taylor concerning the discussions disclosed to the Mesa Police. All claim that the conversations are privileged. Standage acknowledges that on several occasions from late 1971 until 1975, while serving as bishop of Ray's ward, he "interviewed and counseled privately ... with Mr. Ray about various matters," but he declines to disclose the substance of those discussions. Taylor acknowledges that in the fall of 1976, in his capacity as first counselor in the stake presidency in the Mesa, Arizona, Salt River Stake of the LDS Church, he telephoned Ray, then residing in Albuquerque, "to inquire as to his spiritual condition, due to information received ... pertinent to his continued exercise of the rights and privileges accorded an adult priesthood holder and member of the LDS Church...." Taylor declines to disclose the substance of those discussions. Bailey has testified that he served as Ray's ward bishop in 1976 when Ray moved to Albuquerque, New Mexico, but has refused to testify whether, in that capacity, he confronted Ray with allegations of child molesting. He has also refused to testify whether Ray admitted such allegations to him or whether he communicated with church officials in Arizona

concerning allegations of molestations by Ray.

Taylor explains by affidavit that "confession, review, and discussion of more serious sin and error with one's Bishop, Stake President, or Counselors ... is required of every adult member" of the LDS Church; "that all such confessions ... are private and confidential" whether or not the member initiates the confession and regardless of where and when they take place; and that "information received from the member by the Bishop in the above confessions ... is confidentially shared, on occasion, with the Stake President, and/or with his Counselors ... with the express knowledge and/or consent of the member...."

The conversations in question all fell within this ritual of confession, according to the Church, and thus are shielded from discovery by the clergyman/penitent privilege.

### Disposition

The trial judge propounded a line of permissible discovery by making two sets of distinctions. First she distinguished conversations among church officials *about* Ray from conversations by church officials *with* Ray. The former, she found, were not privileged. Thus, Bailey could be deposed concerning his contact, if any, with Arizona church officials about Ray. Second, as to conversations with Ray, the trial court distinguished privileged "confessional communications," i.e., statements "penitential in nature for the purpose of seeking religious or spiritual advice, aid, or comfort," from unprivileged "statements of guilt elicited during interviews." She concluded, as we understand her ruling, that the plaintiff could proceed with discovery to determine whether portions of Ray's conversations with the other deponents fell within the protected first category or the unprotected second. Thus, plaintiff's counsel could ask the deponents such questions as 1) who initiated contact with Ray; 2) what led the others to initiate contact with Ray, if they did so; 3) what, if anything, the others said to Ray that elicited any

confessions or admissions he may have made; and 4) whether, if Ray made confessions or admissions, he did so "to seek foregiveness."

The Church claims that the trial court erred in distinguishing privileged from non-privileged communications on the basis of Ray's participation and confessional attitude. All were privileged, it claims, even those among church officers in which Ray did not participate, because all related to Ray's spiritual guidance and all were conducted "in the course of the discipline enjoined by the church to which [the deponents] belonged." Moreover, the Church claims that the privilege belongs both to Ray *and* to the officers of the Church. Ray's privilege, it claims, is embodied in A.R.S. § 12–2233, whereas that of Standage, Bailey, and Taylor exists, independent of Ray's and unwaivable by Ray, grounded in A.R.S. §§ 8–546.04(C) and 13–3620(G) and in the first amendment to the United States Constitution.

We conclude that the trial judge correctly permitted discovery to proceed, but we take a different route than hers to this conclusion. We do not decide the validity of the trial court's distinction between confessional communications and interviews. Our disposition on other grounds makes it unnecessary for us to do so. Rather, assuming *arguendo* that all conversations were originally privileged, we hold:

1. that Ray, in disclosures to the Mesa Police Department, waived any privilege that might otherwise have applied to his conversations with or to conversations among Standage, Bailey, and Taylor; and

2. that those church officers have no statutory privilege independent of Ray's.

As for the church's first amendment argument, we find the present record inadequate to support its assertion, as we shall more fully explain below.

### *Waiver*

"A privilege in the law of evidence is a right which a person has in a given instance to prevent the revelation of otherwise material and relevant evidence." Udall & Livermore, Law of Evidence § 71 at 123 (2nd ed. 1982).

The clergyman/penitent privilege is codified in Arizona in A.R.S. § 12–2233, which provides:

> In a civil action a clergyman or priest shall not, without the consent of the person making a confession, be examined as to any confession made to him in his character as clergyman or priest in the course of discipline enjoined by the church to which he belongs.

It is one of five privileges codified in title 12, chapter 13, art. 4 of the Arizona Revised Statutes. The others are husband and wife (§§ 12–2231, 2232), attorney and client (§ 12–2234), physician and patient (§ 12–2235), and reporter and informant (§ 12–2237).[3]

■ Each of these statutory privileges belongs to the communicant, not the recipient, of a confidential communication, and each but the last permits disclosure by the recipient only upon the consent of the communicant. *See* Udall & Livermore § 71 at 126 ("Privileges as to confidential communications customarily belong to the person making the communication. Because it is that person's conversational privacy that is being protected only he has the right to prevent revelation."). Thus, as embodied in these statutes, the husband and wife privilege belongs to each spouse, and neither spouse may disclose the other's confidences without the other's consent; the attorney/client privilege belongs to the client, and an attorney may not disclose the client's confidences without the client's consent; the physician/patient privilege belongs to the patient, and a physician may not disclose a patient's confidences without the patient's consent; and the clergyman/penitent privilege belongs to the penitent, and a clergyman may not disclose a

---

**3.** Various other privileges may be found throughout Arizona's constitution, statutes, and case law. They include the accountant/client privilege, psychologist/patient privilege, motor vehicle accident report privilege, informer privilege, and various governmental records privileges, *See* Udall & Livermore §§ 76 and 77 at 147–159.

penitent's confidences without the penitent's consent.

A form of implied consent is statutorily recognized in A.R.S. § 12–2236, but only as to the attorney/client and physician/patient privileges. That statute provides:

A person who offers himself as a witness and voluntarily testifies with reference to the communications referred to in § 12–2234 and 12–2235 thereby consents to the examination of such attorney, physician or surgeon.

The express provision of § 12–2236 for implied waiver of the attorney/client and physician/patient privilege was significant to the trial court's conclusion that Kenneth Ray did *not* waive his privilege by his comments to the Mesa Police. From the absence of any comparable statutory provision for implied waiver of the clergyman/penitent privilege, the trial court inferred a legislative intent that such a waiver must be express, not implied. Ray has never expressly consented to the disclosure of his communications to Standage, Bailey, or Taylor. Accordingly, in the trial court's view, he has never waived whatever privilege might attach to those communications.

We disagree. We hold that the clergyman/penitent privilege, like other privileges, is susceptible to implied waiver through conduct inconsistent with the maintenance of conversational privacy, and we find such waiver in the conduct of Ray.

We first note that, even concerning the attorney/client privilege and the physician/patient privilege, A.R.S. § 12–2236 does not occupy the entire field of implied waiver. Though that statute prescribes one form of implied waiver, it does not abrogate other forms of waiver accepted at common law. *Throop v. F.E. Young & Co.*, 94 Ariz. 146, 382 P.2d 560 (1963); *Bain v. Superior Ct.*, 148 Ariz. 331, 714 P.2d 824 (1986). Thus, though the attorney/client and physician/patient privileges are susceptible to statutory testimonial waiver pursuant to A.R.S. § 12–2236, they also remain susceptible to common law waiver by "any course of conduct inconsistent with observ-

ance of the privilege." *Bain*, 148 Ariz. at 334, 714 P.2d at 827.

Privilege statutes, which impede the truth-finding function of the courts, are restrictively interpreted. *See, e.g.,* Udall & Livermore, § 71 at 124 ("[P]rivileges, being in derogation of the truth, are to be strictly construed."). Exceptions are few and narrow to the proposition that "the public ... has a right to every [person's] evidence." *Trammel v. United States,* 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186, 195 (1980) (quoting *United States v. Bryan,* 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884, 890–891 (1950)). Compelling privacy needs are served and confidential communications promoted by the recognized areas of evidentiary privilege. Yet, by the doctrine of implied waiver, the law recognizes that the need for privilege dissolves and the public's evidentiary interest regains primacy once the privilege holder, the communicant, has abandoned privacy and confidentiality through inconsistent conduct.

The common law doctrine of implied waiver by inconsistent conduct remains applicable to the physician/patient and attorney/client privileges even though our legislature has statutorily prescribed a narrower form of waiver of those privileges in A.R.S. § 12–2236. It follows, in our opinion, that the legislature by its silence has left the grounds for waiver of the clergyman/penitent privilege entirely to common law. These grounds, we hold, include waiver by inconsistent conduct.

We further find such waiver in Kenneth Ray's disclosures to the Mesa Police Department. Ray revealed to the police not only the fact, but the substance of his communications with Standage, Bailey, and Taylor. "Where the one making the privileged conversation tells the facts to other third parties, the privilege is waived and the minister ... may be allowed to testify as to the communication made to him." *State v. Andrews,* 187 Kan. 458, 357 P.2d 739, 744 (1961). *See also Perry v. State,* 280 Ark. 36, 655 S.W.2d 380 (1983).

The Church does not stand on the trial court's analysis of the issue of waiver.

Rather, it acknowledges that the clergyman/penitent privilege is subject to implied waiver under *Bain*. The Church contends, however, that the Mesa Police Department failed to meet its constitutional obligation under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), to inform Ray of his right to counsel and his right to remain silent and that, accordingly, his disclosures may not be used against him as a forfeiture of privilege in this proceeding.

We cannot determine from the limited record before us whether the Mesa police investigation comported with the requirements of *Miranda*, but we reject the Church's argument nonetheless. The *Miranda* requirements protect a suspect's right not to be "compelled *in any criminal case* to be a witness against himself." Fifth amendment, United States Constitution. They are not designed to alert a suspect to the prospective abandonment of an evidentiary privilege that he might otherwise assert in a later *civil* case.

### No Independent Statutory Privilege for Clergy

■ The Church next claims that, even if Ray waived his penitent's privilege under A.R.S. § 12–2233, Standage, Bailey, and Taylor are independently privileged as priests to withhold consent to disclosure of their conversations with and about Ray. This independent privilege, the Church claims, is conferred by A.R.S. §§ 13–3620(G) and 8–546.04(C).

A.R.S. § 13–3620(G) provides:

In any civil or criminal litigation in which a child's neglect, dependency, abuse or abandonment is an issue, a clergyman or priest shall not, *without his consent* be examined as a witness concerning any confession made to him in his role as a clergyman or a priest in the course of the discipline enjoined by the church to which he belongs. Nothing in this subsection discharges a clergyman or priest from the duty to report pursuant to subsection A of this section.

(Emphasis added.)

A.R.S. § 8–546.04(C) provides:

In any civil or criminal litigation in which a child's neglect, dependency, abuse or abandonment is an issue, a clergyman or priest shall not, *without his consent* be examined as a witness concerning any confession made to him in his role as a clergyman or a priest in the course of the discipline enjoined by the church to which he belongs.

(Emphasis added.)

The legislative intent to confer a separate, independent privilege upon the clergy may be found, according to the Church, in the statutory words "without his consent." The word "his" refers to the clergyman or priest. Whereas the penitent's consent is prerequisite to testimony under § 12–2233, the clergyman's consent is prerequisite to testimony under §§ 13–3620(G) and 8–546.-04(C); and this, according to the Church, constitutes the conveyance of an independent privilege to the clergy.

The trial court did not reach this issue. Rather it held both statutes inapplicable because they "are limited in application to litigation in which a child's neglect or abuse, etc., is an issue." The trial court defined the issues in this case as "whether the church was negligent in its counseling and treatment of Kenneth Ray and whether it was negligent in failing to report the conduct of Kenneth Ray to law enforcement officials." A child's abuse, it held, was not among the issues.

We disagree. It appears that Kenneth Ray has admitted in deposition that he abused the plaintiff's child and that the Church has admitted the same in trial court pleadings. Yet, even if the fact of abuse is conceded, this remains, in our opinion, a civil action "in which a child's ... abuse ... is an issue" within the meaning of both statutes. The plaintiff seeks to prove that the Church was a causal participant in the chain of circumstances resulting in the child's abuse, and the plaintiff seeks to prove the damages resulting from the child's abuse. The statutes clearly apply.

Returning to the Church's contention, however, in neither § 13–3620(G) nor § 8–546.04(C) do we find a legislative intent

to create a testimonial privilege for the clergy independent of the penitent's consent. Rather, we find in legislative history the purpose to partially restore the *penitent's* privilege, which had been abrogated by earlier versions of those statutes.

We begin our examination of this history with A.R.S. § 12–2233, which establishes the clergyman/penitent privilege, and which requires *"the consent of the person making a confession"* before a clergyman may be examined as to that confession in a civil action. This statute or one like it has been a part of Arizona law since territorial days. Civ.Code 1901, § 2535.

Our legislature first adopted a child injury reporting statute, A.R.S. § 13–3620, in 1964. (See current text of A.R.S. § 13–3620(A) in footnote 2, *supra*.) In 1976, the legislature amended that statute to accomplish the abrogation of various evidentiary privileges in a limited category of cases. Section 13–3620(C) as amended, Laws 1976, ch. 171, § 3, eff. June 27, 1976, provided in part:

> The physician-patient privilege, husband-wife privilege or *any privilege* except the attorney-client privilege ... shall not pertain in any civil or criminal litigation in which a child's neglect, dependency, abuse or abandonment is an issue nor in any judicial proceeding resulting from a report submitted pursuant to this section.

(Emphasis added.)

That provision is now contained in A.R.S. § 13–3620(F). A virtually identical provision has existed since 1970 in A.R.S. § 8–546.04(B) as part of our child protective services statute.

The abrogative language of A.R.S. §§ 13–3620 and 8–546.04 was broadly written and included the clergyman/penitent privilege. In 1982, however, the legislature concluded that, although clergymen should remain obliged to report endangered children pursuant to A.R.S. § 13–3620(A), the clergyman/penitent privilege should in other respects be fully restored. The minutes of the senate judiciary committee indicate that §§ 13–3620(G) and 8–546.04(C) were adopted as companion measures to that end:

> Senator [Luis] Gonzales, sponsor, explained that generally, in civil and criminal proceedings a clergyman or priest cannot be examined as to a confession made to him in his professional capacity *unless the person making the confession consents to the disclosure.* In any criminal or civil action relating to a child's neglect, dependency, abuse or abandonment, only the attorney-client privilege is recognized. As introduced, S.B. 1147 (establishing both 13–3620(G) and 8–546.04(C)) would amend the mandatory child abuse reporting law and the child protective services article to include the clergyman or priest—penitent privilege.

(Emphasis added.)

Statutes are construed to advance their underlying purpose. *State v. Sweet,* 143 Ariz. 266, 270, 693 P.2d 921, 925 (1985). Although the legislative history of §§ 13–3620(G) and 8–546.04(C) reveals the purpose to *re-establish* the clergyman/penitent privilege in child-related litigation, we find no broader purpose to *expand* that privilege beyond the general limits long established by A.R.S. § 12–2233. Indeed, the Church itself describes as the apparent purpose of §§ 13–3620(G) and 8–546.04(C) "to require the clergy to report child abuse cases ..., but not to invade unnecessarily the priest/penitent privilege in A.R.S. § 12–2233." We agree.

As for the purpose of § 12–2233, it was well described, in our view, by the Court of Appeals of New York, when it defined a comparable New York statute as a legislative response "to the urgent need of people to confide in, without fear of reprisal, those entrusted with the pressing task of offering spiritual guidance so that harmony with one's self and others can be realized." *Keenan v. Gigante,* 47 N.Y.2d 160, 417 N.Y.S.2d 226, 229, 390 N.E.2d 1151, 1154 (1979). This "urgent need" is the penitent's, not the clergyman's. And once the penitent has waived the privilege, his penitential need is unserved and the public's evidentiary need disserved by permitting a

clergyman to assert the privilege independently.

The Church urges us in its brief "to harmonize [A.R.S. §§ 13–3620(G) and 8–546.04(C) with § 12–2233,] to make them consistent and to give effect to both." We seek to do so. As our supreme court stated in *State v. Sweet*, 143 Ariz. at 270, 271, 693 P.2d at 925, 926, quoting *State ex. rel. Larson v. Farley*, 106 Ariz. 119, 122, 471 P.2d 731, 734 (1970):

> If reasonably practical, a statute should be explained in conjunction with other statutes to the end that they may be harmonious and consistent. If the statutes relate to the same subject or have the same general purpose—that is, statutes which are in pari materia—they should be read in connection with, or should be construed together with other related statutes, as though they constituted one law. As they must be construed as one system governed by one spirit and policy, the legislative intent therefor must be ascertained not alone from the literal meaning of the wording of the statutes but also from the view of the whole system of related statutes. This rule of construction applies even where the statutes were enacted at different times, and contain no reference one to the other....

■ Thus, we construe A.R.S. § 13–3620(G) and 8–546.04(C) "to the end that they may be harmonious and consistent" with the language and purpose of A.R.S. § 12–2233. We are aided in this construction by the legislative history of their adoption. We are also aided in this construction by the previously stated precept that privilege statutes are narrowly construed to minimize their encroachment on the public's right to relevant evidence. We hold that A.R.S. § 13–3620(G) and 8–546.04(C) do not create a statutory clergyman's privilege independent of the penitent's privilege under A.R.S. § 12–2233. Rather, they reinstate in child related litigation a clergyman's ability *to withhold consent on the penitent's behalf* to exami-

nation of the clergyman concerning his penitent's confidential communications. Where, however, as here, the penitent has waived the privilege through disclosures inconsistent with its preservation, the privilege is dissolved, and a clergyman is left no statutory basis to independently withhold consent to provide relevant evidence in a court of law.

### The First Amendment Argument

The church next asserts a first amendment basis for the recognition of an independent clergymen's privilege to withhold consent to the disclosure of a penitent's confession, even after the penitent has waived the confidentiality of the confession. The church is supported in its argument by Amicus Curiae the Diocese of Arizona, speaking on behalf of the Episcopal Church of Arizona.

The Diocese informs us that the ritual of confession in the Episcopal Church entails "the absolute obligation not to reveal anything revealed by a penitent using the Sacrament of Penance," and that it "admits of no exception." Cross, *The Oxford Dictionary of the Christian Church*, 1234 (London, 1957).[4] Likewise, "in the Roman Catholic Church the lips of clergy are absolutely sealed" concerning a communicant's confession, according to the Diocese, citing Codex Juris Canonici, §§ 889, 890, and 2369. Because some religions thus impose an absolute clerical vow of silence concerning confessional communications, apparently unaffected by waiver by the penitent himself, we are urged to acknowledge an independent clerical right to withhold testimonial disclosure. Otherwise, upon the waiver by a penitent, a clergyman of such a faith could be subjected to the state's compulsion to violate his personal, religious obligation to remain silent. Such compulsion, the Church and Diocese argue, would burden the free exercise of religion in violation of the first amendment to the United States Constitution.

This argument raises complex issues far beyond the present record, and we need not

---

**4.** By request for clarification filed after the release of our original opinion, the Diocese has informed us that, under church doctrine, an Episcopal priest is released from his vow of silence only if the confessant personally and di-

rectly releases the priest and if the priest is satisfied that the release is given freely, intentionally and knowingly. We have added this footnote by way of clarification.

address them in this case. Nowhere in this record does the LDS Church represent that its priests are similarly bound by an absolute obligation of silence, unwaivable by a penitent. Nowhere do Standage, Bailey, and Taylor assert that, even if Ray waived his right to keep the communications confidential, they are independently obliged by religious conviction to make no disclosures of their own. The record, in fact, suggests a contrary practice in the LDS Church. We note, for example, the behavior of Allen Farnsworth, a local stake president in the Church. After Ray was excommunicated, Farnsworth reported him to the state Child Protective Services Agency, participated in the decision by LDS Social Services to turn over Ray's victim list to the Mesa Police Department, and consented to be deposed concerning his discussions with Ray, all without the invocation of the clergyman/penitent privilege.

Because there is no basis in the present record to support the position that the depositions intended by the plaintiff would violate the religious obligations of Standage, Bailey, or Taylor, we decline to determine whether, on a different record, a clergyman might have constitutional grounds to assert a privilege independent of the penitent's.

### Conclusion

For the reasons stated in this opinion, we accept review, but deny relief.

CONTRERAS, P.J., and KLEINSCHMIDT, J., concur.