Michelle SCOTT, Plaintiff,

v.

Steven LeRoy HAMMOCK, Defendant.

No. 89–C–267 S.

United States District Court,
D. Utah, C.D.

Dec. 7, 1990.

Ross C. Anderson, Linda M. Jones, Salt Lake City, Utah, for plaintiff.

Mary C. Corporon, Oscar McKonkie, Salt Lake City, Utah, for defendant.

## MEMORANDUM DECISION AND ORDER

RONALD N. BOYCE, United States Magistrate Judge.

The plaintiff, Michelle Scott, filed suit against defendant, Steven LeRoy Hammock, plaintiff's father by adoption. The plaintiff alleged that defendant had engaged in various forms of abuse of plaintiff during her childhood. The jurisdiction of this court is based on diversity of citizenship (28 U.S.C. § 1332). Following discovery by the respective parties, the plaintiff served a deposition subpoena on the office of the Presiding Bishopric of The Church of Jesus Christ of Latter–Day Saints to require the production of documents disclosing or relating to any excommunication of defendant, or proceedings, or determinations of such a nature with respect to defendant. The plaintiff also sought documents disclosing or relating to any communications containing any references respecting the sexual or other physical abuse of defendant's adopted children. The subpoena requested the identification of persons present during a Bishop's Court[1] proceedings in which communications with Steven LeRoy Hammock about sexual or other physical abuse were discussed. On October 16, 1990 the Church of Jesus Christ of Latter–Day Saints (LDS Church) filed a motion to quash the subpoena. It was contended in the motion that the requested communications and information are privileged under "Utah Code Ann. § 78–24–8 and Rule 501, Utah Rules of Evidence".[2] The L.D.S. Church also raised a claim that the subpoena from this court violated the Free Exercise Clause of the First Amendment of the United States.[3]

The defendant thereafter sought a protective order against the disclosure of such information contending it was protected by an "ecclestical" (sic) privilege. Therefore, defendant has joined in the motion to claim any ecclesiastical privilege that may be applicable.

The plaintiff has replied to the motion to quash contending that the defendant, Steven LeRoy Hammock's own deposition, shows that any communication between

1. Bishop's Court is a term referring to a body of persons who investigate, direct, and perform various ecclesiastical sanction functions in the Church of Jesus Christ of Latter–Day Saints (LDS). The church is colloquially known as the "Mormon Church" because of the religious Book of Mormon which is an authoritative doctrinal and historical text of the Church.

2. Rule 501 F.R.E. looks to state law to determine the availability of a privilege in a diversity jurisdiction case.

3. The L.D.S. Church also urged Article I § 4 of the Utah Constitution as a basis for the relief the Church seeks. The provision of the Utah Constitution also contains a free exercise clause along with other provisions. It does not appear that the Utah Supreme Court has made an interpretation to this provision, and in the context of this case it will be assumed the free exercise clauses of the two constitutions are concomitant to one another. It would be difficult to construe the Utah Constitution differently without drawing it into direct conflict with the United States Constitution's provisions which require a "delicate balance" between the free exercise and establishment causes. See McConnell, *The Religion Clauses of the First Amendment: Where is the Supreme Court Heading*, 1990 First Amendment Law Handbook 269, 276–278.

plaintiff and his L.D.S. Church Bishop[4] was outside the claim of privilege because it was not "confessional" or "penitential". (Pl.Memo, File Entry # 54 p. 2). The deposition of defendant discloses the following:

At the first meeting at your home when you met alone with the bishop, was that meeting in the context of confessing or seeking forgiveness for anything you had done?

Ms. Corporan: Again, a yes or no.

[Defendant]: No

Mr. Anderson: And at the second meeting when you were with your wife, was that meeting in the context of you seeking forgiveness or making a confession?

[Defendant]: No.

And what was discussed by whom at that meeting?

Ms. Corporon: Same objection:

[Defendant]: Same objection. Do I have to say it?

Ms. Corporon: You can just say that you refuse to answer.

[Defendant]: I refuse to answer it on the advice of my counsel.

Mr. Anderson: Do you know what a penitent is?

[Defendant]: Do I know what a penitent is?

Mr. Anderson: Penitent.

[Defendant]: I think it has something to do with the Catholic religion, but I don't know. I know what the word means.

Mr. Anderson: Somebody seeking forgiveness through confessing their sins.

[Defendant]: I know what that word means, yes.

Mr. Anderson: And were you a penitent at the time of either of these three communications with your bishop.

[Defendant]: No.

The plaintiff's position is that the clergyman privilege only applies to a "confession". Further, it has been agreed by the parties that defendant did not attend the bishop's court proceedings after which the defendant was excommunicated from the

LDS Church. Also, at hearing on this motion, counsel for the LDS Church advised that no record is kept of bishop's court proceedings, the process is not an adversarial court process, and the only documentation is the notice of excommunication which contains only an order of excommunication.

The defendant contends his communication with his LDS Church bishop was within the religious doctrines of the church and this is confirmed by counsel for the church and not contested by plaintiff. The communication was apparently non-confessional and non-penitential, but one in which defendant sought religious guidance or advice. Further, the bishop apparently transmitted the information to a "Stake" bishop's court because the position the defendant held in the LDS Church placed the matter beyond the bishop's authority for ecclesiastical discipline. The LDS Church contends the intra church transmittal of information is within the clergy privilege.

*Applicable Law*

■ Rule 501, F.R.E. provides:

However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, ... *shall be determined in accordance with state law.* (Emphasis Added).

Since Utah law is the law of decision in this case, whether a privilege exists to justify quashing the subpoena served on the LDS Church must be determined by Utah law. *Liew v. Breen,* 640 F.2d 1046 (9th Cir.1981); *Seidman v. Fishburne–Hudgins Educational Foundation, Inc.,* 724 F.2d 413 (4th Cir.1984) (priest penitent privilege. Virginia law applicable).

Rule 501, Utah Rules of Evidence, 1983 provides:

Privilege is governed by the common law, except as modified by *statute* or court rule. (Emphasis Added).

---

**4.** A bishop is an ecclesiastical official at a particularly important level in the L.D.S. Church hierarchy.

There is no court rule for a clergy/penitent privilege under the Utah Rules of Evidence.[5] However, a Utah statute does address such a privilege. Utah Code Ann. § 78–24–8(3) provides:

> A clergyman or priest cannot, without the consent of the person making the confession, be examined as to any confession made to him in his professional character in the course of the discipline enjoined by the church to which he belongs.

This statute was enacted in 1951, Chapter 58 § 1, Laws of Utah 1951. The Compiled Laws of Utah 1876[6] § 381 provided during the Utah Territory:

> A clergyman or priest cannot, without the consent of the person making the confession, be examined as to any confession made to him in his professional character in the course of discipline enjoined by the church to which he belongs.

Thus the current Utah law is identical with the law of Utah as far back as 1876. The Utah law was reenacted in Compiled Laws of Utah 1888 § 3878(3), and in the Revised Laws of Utah 1898, 1933, 1943 and again in 1951.

## DISCUSSION

■ There is no question the communication in this case was made to the LDS Church bishop "in the course of the discipline" of the LDS Church. This has been represented as being the case by the church counsel and no contrary evidence is presented. It is the nature of the communication which the plaintiff contends is not within the privilege.

Second, there is no dispute that an LDS Church bishop is a clergyman within the meaning of the Utah statute. Elders[7] and deacons[8] in religious orders have been held to be clergymen for the purposes of the

privilege in other jurisdictions. *Reutkemeier v. Nolte*, 179 Iowa 342, 161 N.W. 290 (1917); *Cimijotti v. Paulsen*, 219 F.Supp. 621 (D.C.Iowa 1963) app. dismissed 323 F.2d 716 (8th Cir.). See also *Rutledge v. State*, 525 N.E.2d 326 (Ind.1988); cases collected in *Annotation*, 49 A.L.R.3d 1205 (1973).

In *State v. Cox*, 87 Or.App. 443, 742 P.2d 694 (App.1987) the court recognized a "mormon minister" as a clergyman within the Oregon clergyman-penitent statute. See also *Church of Jesus Christ of Latter-Day Saints v. Superior Court*, 159 Ariz. 24, 764 P.2d 759 (Ct.App.1988). Consequently, whether a bishop or stake president, as the case may be, such person would, in the context of this case, be a person to whom a religious communications would be privileged if the circumstances otherwise allow. The standard is whether, under the doctrines of the church, the official to whom a communication is made is expected to accept and keep confidential communication from members of the church. The LDS Church in its memorandum (File Entry # 53 p. 3) has presented an excerpt from its *General Handbook of Instructions* which confirms the role and duties of a bishop or stake president of the LDS Church to receive and keep confidential a communication of the church member.

The issue is whether a non-confessional communication, but one confidential within the doctrines of the LDS Church and one in which defendant sought some form of ecclesiastical guidance, is privileged under the Utah statute. No Utah case has been found construing the scope of the statutory privilege. It is of course recognized that an early Indiana case, *Knight v. Lee*, 80 Ind. 201, 203 (1881) said the term "confes-

---

5. There is currently a proposed clergyman's privilege that the Utah Supreme Court's Evidence Rules Committee has proposed, however, the privilege has not yet been accepted by the Utah Supreme Court.

   The privilege that existed under the 1973 Utah Rules of Evidence was repealed by the adoption of the 1983 Rules of Evidence which contain no such privilege.

6. Research materials were not readily available to trace the statute back beyond 1876.

7. An ecclesiastical priesthood position which exists in the LDS Church which is a status also held by a bishop.

8. A deacon is a lesser priesthood status within the LDS Church, it is also an ecclesiastical office in several religions.

sion" is limited to matters penitential in character. However, the court further discussed the need for the communication to be within the course of the church discipline and appeared to reject the application of the confidential communication privilege in that case on the grounds that the person to whom the communication was directed was not acting as a clergyman and the communication was extraneous to the course of church discipline. The case is of little guidance on the issue now before the court.

The privilege of confidential communication between priest and penitent was unknown as common law after the Restoration. Wigmore, *Evidence* (McNaughten Rev.) § 2394. But see *Reg. v. Griffin*, 6 Cox Crim. Cases 219 (1853) (applying privilege). The privilege was also not a part of the American common law. Id. Wigmore, *supra; Commonwealth v. Drake*, 15 Mass. 161 (1818). *Wigmore* refers to "communications made in the understood pursuance of that church discipline which gives rise to the confessional relation ..." This suggests the church discipline may be determinative of what is a protected confidential communication. Wigmore also indicated the justification of the privilege should be assessed under the four criteria that Wigmore asserted as justifying privileges in general. Id. § 2396 referring to § 2285. In that regard the relevant question asked as to the scope of the privilege must be whether the confidentiality of the communication is essential to the ecclesiastical relationship. Id. Applying that criteria to this case, the statute should be given a broader reading than a penitential confession. The Alabama Court in *Santmier v. Santmier*, 494 So.2d 95 (Ala.Civ.App., 1986) spoke in terms of a confession or to seek counsel, comfort, or advice. However, the Alabama statute, Ala.Code 12–21–166 (1986), is expressly broader than the Utah statute.

In, *In re Grand Jury Investigation*, 918 F.2d 374 (3d Cir.1990) the court discussed a proposed federal privilege, and examined

Rule 506 F.R.E.[9], as proposed by the Supreme Court. It was said:

> The choice between a privilege narrowly restricted to doctrinally required confessions and a privilege broadly applicable to all confidential communications with a clergyman in his professional character as a spiritual advisor has been exercised in favor of the latter. Many clergymen now receive training in marriage counseling and handling personality problems. Matters of this kind fall readily into the realm of the spirit.

Id. p. 4

The court noted that rejection by Congress of the Supreme Court's proposed Rule did not eliminate consideration of the privilege (Id. p. 4). The court went on to fully discuss the privilege under Rule 501, F.R.E.:

> Rule 501 replaced a number of proposed rules concerning evidentiary privileges that were adopted by the Supreme Court following extensive study and analysis by the Advisory Committee responsible for codifying federal rules of evidence. As submitted to Congress, Article V of the proposed rules set out thirteen rules encompassing nine specific privileges, including a privilege for communications to clergymen. See Proposed Federal Rules of Evidence, 56 F.R.D. at 183. Rule 506, delineating the contours of the clergy-communicant privilege reads as follows:

Communications to Clergymen

(a) Definitions. As used in this rule:

(1) A "clergyman" is a minister, priest, rabbi, or other similar functionary of a religious organization, or an individual reasonably believed so to be by the person consulting him.

(2) A communication is "confidential" if made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication.

(b) General rule of privilege. A person has a privilege to refuse to disclose and to prevent another from disclosing a confidential communication by the person to

---

**9.** Not adopted by Congress.

a clergyman in his professional character as spiritual adviser.

(c) Who may claim the privilege. The privilege may be claimed by the person, by his guardian or conservator, or by his personal representative if he is deceased. The clergyman may claim the privilege on behalf of the person. His authority to do so is presumed in the absence of evidence to the contrary.

The Advisory Committee's note confirms that proposed Rule 506 is expansive in character:

The definition of "confidential" communication is consistent with the use of the term in Rule 503(a)(5) for lawyer-client and Rule 504(a)(3) for psychotherapist-patient, suitably adapted to communications to clergymen.

The choice between a privilege narrowly restricted to doctrinally required confessions and a privilege broadly applicable to all confidential communications with a clergyman in his professional character as a spiritual adviser has been exercised in favor of the latter. Many clergymen now receive training in marriage counseling and the handling of personality problems. Matters of this kind fall readily into the realm of the spirit. The same considerations which underlie the psychotherapist-patient privilege of Rule 504 suggest a broad application of the privilege for communications to clergymen.

The reference in the Advisory Committee's Note to the group counseling practices common to the psychotherapist-patient relationship and the relationship of lawyers to multiple clients indicates *that the Supreme Court did not view the privilege as limited solely to confidential relationships between two individuals.* Given the requisite showing of confidentiality, proposed Rule 506 would have extended the clergy-communicant privilege to *group discussions.*

Although Congress chose not to adopt the proposed rules on privileges, it did not disapprove them. The Senate Judiciary Committee's report on Rule 501 states:

It should be clearly understood that, in approving this general rule as to privileges, the action of Congress should not be understood as disapproving any recognition of ... any ... of the enumerated privileges contained in the Supreme Court rules. Rather, our action should be understood as reflecting the view that the recognition of a privilege based on a confidential relationship and other privileges should be determined on a case-by-case basis. We believe that the proposed rules provide a useful reference point and offer guidance in defining the existence and scope of evidentiary privileges in the federal courts. We agree with Judge Weinstein and Professor Berger, who state:

[I]n many instances, the proposed rules, [used as] [s]tandards, remain a convenient and useful starting point for examining questions of privilege. The [s]tandards are the culmination of three drafts prepared by an Advisory Committee consisting of judges, practicing lawyers and academicians ... Finally, they were adopted by the Supreme Court....

[T]he Advisory Committee in drafting the Standards was for the most part restating the law currently applied in the federal courts.

The history of the proposed Rules of Evidence reflects that the clergy-communicant rule was one of the least controversial of the enumerated privileges, merely defining a long-recognized principle of American law. Although most of the nine privileges set forth in the proposed rules were vigorously attacked in Congress, the privilege covering communications to members of the clergy was not. S. Saltzburg & K. Redden, Federal Rules of Evidence Manual 333 (4th ed. 1986). Indeed, virtually every state has recognized some form of clergy-communicant privilege. The inclusion of the clergy-communicant privilege in the proposed rules, taken together with its uncontroversial nature, strongly suggests that the privilege is, in the words of the Supreme Court, "indelibly ensconced" in

the American common law. (Emphasis Added).

\*   \*   \*   \*   \*   \*

We believe that the privilege should apply to protect communications made (1) to a clergyperson (2) in his or her spiritual and professional capacity (3) with a reasonable expectation of confidentiality. As in the case with the attorney-client privilege, the presence of third parties, if essential to and in furtherance of the communication, should not void the privilege. This statement of the contours of the privilege is consistent with the provisions of Rule 506, which, as our study of the federal case law confirms, tracks the evolving common law. In addition, we note our agreement with the tenor of the Advisory Committee's Note to proposed Rule 506, which extends the scope of the privilege to encompass not only communications between Roman Catholic priests and their penitents, but also communications between clergy and communicants of other denominations. See Proposed Fed. Rule of Evid. 506 advisory committee's note, 56 F.R.D. at 247.

In *Mullen v. United States*, 263 F.2d 275, 280 (10th Cir.1958) the court observed:

> In our own time, with its climate of religious freedom, there remains no barrier to adoption by the federal courts of a rule of evidence on this subject dictated by sound policy.
>
> Sound policy—reason and experience—concedes to religious liberty a rule of evidence that a clergyman shall not disclose on a trial the secrets of a penitent's confidential confession to him, at least absent the penitent's consent. Knowledge so acquired in the performance of a spiritual function as indicated in this case is not to be transformed into evidence to be given to the whole world. As Wigmore points out, such a confidential communication meets all the requirements that have rendered communications between husband and wife and attorney and client privileged and incompetent. The benefit of preserving these confidences inviolate overbalances the possi-

ble benefit of permitting litigation to prosper at the expense of the tranquility of the home, the integrity of the professional relationship, and the spiritual rehabilitation of a penitent. The rules of evidence have always been concerned not only with truth but with the manner of its ascertainment.

In *State v. Gotfrey*, 598 P.2d 1325, 1329 (Utah 1979) Justice Stewart, currently a member of the Utah Supreme Court, in his concurring and dissenting opinion, while discussing the Utah psychologist psychotherapist privilege, said:

> The policy underlying that privilege is rooted in the belief that individuals and society at large may be greatly benefited by fostering a sound therapeutic relationship in the interest of preserving families, enhancing individual development and growth, and allowing persons to deal with problems which might otherwise erupt into serious individual and societal difficulties, at least some of which would likely end up in the court system by way of divorces, crime, and juvenile delinquencies. The beneficial effects that may emerge from a therapeutic relationship cannot be fully achieved, and perhaps cannot be achieved at all, unless there is a trusting relationship between a psychologist and patient which is founded on a sense of complete confidentiality. Only on that basis are most persons willing to open up their innermost personalities and disclose the most private and sometimes painful aspects of their inner selves. *At least in some measure, the privilege in question is supported by considerations similar to those that support the priest-penitent privilege.* (Emphasis Added).

From these authorities it can be seen that the modern trend of cases construing the scope of the clergy privilege is to read it more broadly than merely being applicable to "confessions" in the penitential sense, but to apply it to communications for religious counseling. Further, Justice Stewart's observation may suggest the Utah Court would read the Utah clergy

privilege statute more broadly than its literal language.

The plaintiff makes a compelling and legitimate argument that the Utah statute should be given an interpretation in keeping with its plain language. The plaintiff refers to *Lucy v. State,* 443 So.2d 1335, 1341 (Ala.1983); *Johnson v. Commonwealth,* 310 Ky. 557, 221 S.W.2d 87, 89 (Ky.1949); *Radecki v. Schuckardt,* 50 Ohio App.2d 92, 361 N.E.2d 543, 546 (Ohio App. 1976); *In re Soeder's Estate,* 7 Ohio App.2d 271, 220 N.E.2d 547 (Ohio App. 1966); and *Church of Jesus Christ v. Superior Court,* supra. However, *Soeder* refers to the "confessional relation" which is language broader than "confession" and the court talks in terms of sin, which would probably be involved in this case if plaintiff's claims are true.[10] *Radecki* does indeed seem to use the term confession in a literal sense.

*The Church of Jesus Christ v. Superior Court,* supra, is most significant since it involved an LDS Church member in making communications to an LDS Stake president and bishop about child molestation. Excommunication followed and the court case involved an attempt to discover the information from the two church officers, a civil suit. The court expressly did *not* decide the scope of privilege under the Arizona statute (although the trial judge did). It decided the case on the basis of waiver. However, the court spoke in terms of the "penitent's confidences ..." Id. 764 P.2d p. 763.[11]

If the cases cited by the plaintiff are controlling and a strict "confession" communication is required for the privilege to apply, the defendant's and LDS Church objections to discovery must fail. Certainly a number of courts have used the traditional language as requiring a penitential communication. See *Annotation,* 71 A.L. R.3d 794, 808 (1976). The decision of the court in *In re Swenson,* 183 Minn. 602, 237 N.W. 589 (1931) is, however, instructional on this point. The court noted that to so narrowly construe the statute would virtually limit its application to the Roman Catholic Church.[12] The court construed the term confession to mean an acknowledgement of an actual or supposed wrongdoing while seeking religious or spiritual advice. This would protect a statement of fact admitting wrongdoing, if a part of the church members' reason for a communication, were to obtain religious counseling. Under such circumstances, a communication would be deemed a "confession" and therefore a protected communication.

The construction of the Utah statute requires a search for the legislative intent. *Young v. Barney,* 20 Utah 2d 108, 433 P.2d 846 (1967); *Johnson v. State Tax Commission,* 17 Utah 2d 337, 411 P.2d 831, 832 (1966) ("the fundamental consideration which transcends all others in regard to the interpretation and application of a statute is: What was the intent of the legislature?"); *American Coal Co. v. Sandstrom,* 689 P.2d 1 (Utah 1984); *Gleave v. Denver & Rio Grande Western R. Co.,* 749 P.2d 660 (Utah App.1988) cert. denied 765 P.2d 1278. The Utah Supreme Court has said it is the court's duty to construe statutes liberally with a view to effecting their objects and promoting justice. *Brickyard Homeowners' Assn. Management Com-*

---

10. However, what is "sin" is going to vary according to the tenets of the religion involved.

11. The Arizona court did not address the First Amendment issue raised by the LDS Church. In this case, the record shows the LDS Church has raised the First Amendment issue and the only relevant evidence is that Church doctrine (i.e. the Handbook) requires the church official to keep the communication confidential. However, the First Amendment issue does not require a determination of whether the Church has a constitutional right to confidence as distinct from the plaintiff. The plaintiff's free exercise right, if such exists, would be adequate constitutional protection for both the plaintiff and the LDS Church. The possibility of a free exercise claim by the church also raises issues of respecting an establishment of religion and involves significantly more complex considerations. These issues have not been developed in the parties memoranda and are unnecessary to the resolution of the issue before the court. No position is expressed on this subject.

12. This could well raise not only First Amendment issues but matters of equal protection of the law. See infra pp. 618–619.

*mittee v. Gibbons Realty Co.,* 668 P.2d 535 (Utah 1983).

In keeping with these standards the question must be asked whether this court can say that the Utah territorial and State Legislature intended to use the term confession in the narrow sense suggested by some of the cases previously noted? The term confession, if narrowly read, would exclude acknowledgements that were made in the course of solicitation of religious counseling and advice. This would exclude from protection a significant amount of religious confidences that many religions in Utah would deem an important part of the discipline of their faith. It is difficult to believe or concede that the Utah territorial legislature, around 1876, would have intended to limit the term confession to something akin to the Catholic religion where the dominant church in the Territory did not follow that form of religious practice. The LDS Church points out the use of the term "priest or clergyman" in the Utah statute as indicative of broader legislative intent. Further, the stress on "confession" is at the dilution of the language "in the course of the discipline enjoined by *the church* to which he *belongs.*" (Emphasis added). This language suggests an intent to let the religious discipline of the church determine the need for the privilege within the context of the other elements of the statute. The real question is how would the Utah Supreme Court construe the statutory privilege? Would that court restrict the term "confession" to the narrow construction as contended for by plaintiff? It is believed the Utah Supreme Court would find the legislative intent, at least, more closely to the position taken by the Minnesota Supreme Court in *In re Swenson,* supra.

█ A second reason is also compelling for a more liberal construction of the privilege. A statute should be construed, if possible, to avoid an unconstitutional application. *United States v. Clark,* 445 U.S. 23, 100 S.Ct. 895, 63 L.Ed.2d 171 (1980); *St. Martin Evangelical Lutheran Church v. South Dakota,* 451 U.S. 772, 101 S.Ct. 2142, 68 L.Ed.2d 612 (1981); *Amos v. Corporation of Presiding Bishop of Church of Jesus Christ of Latter–Day Saints,* 594 F.Supp. 791 (D.C.Utah 1984); Sutherland, *Statutory Construction,* 412 Ed 345.11. The Utah Supreme Court has followed this position by reading into statutes an interpretation that conforms to constitutional standards. *In re Boyer,* 636 P.2d 1085 (Utah 1981); *State v. Casarez,* 656 P.2d 1005 (Utah 1982); *State v. Lindquist,* 674 P.2d 1234 (Utah 1983). A broader construction of the statute in this case would also comport with the trend of modern rules and cases. *In re Grand Jury,* supra. Of course, a construction of such a nature cannot be pressed to the point of being a disingenuous evasion. *United States v. Locke,* 471 U.S. 84, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985).

█ The defendant's and LDS Church claim of a free exercise privilege in the defendant, which is urged in opposition to plaintiff's request for disclosure, is not without substantial merit. In this case, the State of Utah has not remained neutral as to its privilege legislation. This case does not involve the refusal of the State to recognize a privilege for religious confidences.[13] The State has provided a special privilege for persons of religious beliefs that certain intra-faith communications are to be kept confidential. The action of the State of Utah is direct action having an impact on the free exercise of religion and its content is direct legislation affecting religion. The legislation is arguably an attempt to accommodate the constitutional right of a person to free exercise of their religion. However, to the extent an interpretation of the statute would preclude protection to some communications that are confidential under the religious teachings

---

**13.** Where the restriction that a state places on an activity is neutral, and the impact on religion is merely incidental, there is no violation of the free exercise clause. *Employment Division v. Smith,* —— U.S. ——, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). The state may reasonably legislate to accommodate religious practices by excluding obligations otherwise owed by the public at large. *Corporation of Presiding Bishop v. Amos,* 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987).

of one faith, but allow those for other faiths, there are both free exercise and establishment problems raised. Under the free exercise clause the state may not, without a demonstration of a compelling state interest, discriminate against one religious practice in favor of another. *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). The state may not unjustifiably burden an individual's free exercise of religion where a state regulation is related to a religious practice and not one of general application to all religions. Id. In this case, religious communication is targeted by the state statute. If the statute were construed in manner urged by plaintiff it would respect some religious establishments but exclude others from its protection without any demonstrable justification. This construction would raise a distinct concern about respecting an establishment of religion by advancing one religion and inhibiting another. c.f. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971); *Wallace v. Jaffree*, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985). It also raises an analogy to equal protection issues but under the First Amendment. See, *Developments in the Law–Religion and the State,* 100 Harvard L.Rev. 1606, 1721 (1987).

▇ From these observations, it is apparent the constitutional claims of defendant and the LDS Church are substantial. Utah Code Ann. § 78–24–8 should not be interpreted to enhance a constitutional conflict if the statute can be reasonably interpreted to avoid the conflict. In this case, it seems appropriate to use the term "confession" to mean a confidential communication within the doctrine of the church involved. The privilege should respect the privacy of the communication in the case of an intra-faith communication unless there is a compelling state interest to the contrary.[14] Therefore, in the context of this case, the communications of defendant, to either his LDS Church bishop or state president, were confidential; they were for the religious purpose of receiving church counseling and ecclesiastical advice. Therefore, the communications are privileged from discovery.

▇ The intra-faith communications from one ecclesiastical officer to another for the purpose of carrying out church discipline are also protected. *Reutkemeier v. Nolte*, supra, *In re Verplank*, 329 F.Supp. 433 (D.C.C.D.Cal.1971); *In re Grand Jury*, supra.

It is appreciated that the communication in this case is different than one that involves a declaration by the church member to an assemblage of church officials. In this case, the communication was passed vertically from one religious authority up to another within the church hierarchy. Such communication was necessary as a part of the church sanction process and in carrying out church discipline. The need for the privilege to follow the communication in such circumstances is obvious and appropriate. Otherwise, the privilege would be destroyed and the confidence abridged. Therefore, the repeating of the defendant's statement and its communication to superior religious authorities must be deemed cloaked with confidentiality and privileged[15] from forced disclosure.

Applying the above standards to the defendant's motion for a protective order, and the LDS Church's motion to quash in this case,

IT IS HEREBY ORDERED that the motion for a protective order of defendant and motion to quash of the LDS Church is granted as to the communications requested in paragraph two of the subpoena. The only record from the LDS Church disciplinary proceedings involving defendant is a simple order of excommunication, which is not relevant information to these proceedings or likely to lead to relevant information. The names of persons present at the

---

**14.** This court has no reason to develop this issue beyond the facts of this case. See Mitchell, *"Must Clergy Tell? Child Abuse Reporting Requirements Versus the Clergy Privilege and Free Exercise of Religion",* 71 Minn.L.Rev. 723 (1987).

**15.** The parties have not raised any issue as to defendant's wife being present during one communication and the court will not *sua sponte* consider the circumstance as affecting this case. See *In re Grand Jury,* supra.

LDS Church Bishop's Court proceedings, involving the plaintiff, are not necessarily protected under the statute, but any information such persons may have about the proceedings is within the privilege. Therefore, at this time, the names of such persons need not be disclosed. However, if plaintiff can show some basis for disclosure that would involve pursuit of nonprivileged information, an order on that issue will be reconsidered.