844 P.2d 593

The SAMARITAN FOUNDATION, an Arizona corporation; Samaritan Health Services, dba Good Samaritan Regional Medical Center, an Arizona corporation; Cathey Milam Chester and Elaine Fraiz, Petitioners,

Lawrence J. Koep, M.D., P.C., an Arizona corporation and Lawrence J. Koep, M.D., Defendants–Petitioners,

v.

SUPERIOR COURT of the State of Arizona, IN AND FOR THE COUNTY OF MARICOPA, the Honorable Stanley Z. Goodfarb, a judge thereof, Respondent Judge,

Arista Mia DAWSON, a minor, by and through her next friend and natural father, Robert E. Dawson; Robert E. Dawson, and Dale M. Dawson, husband and wife, Real Parties in Interest.

PHOENIX CHILDREN'S HOSPITAL, INC., an Arizona corporation, Petitioner,

v.

SUPERIOR COURT of the State of Arizona, IN AND FOR THE COUNTY OF MARICOPA, the Honorable Stanley Z. Goodfarb, a judge thereof, Respondent Judge,

Arista Mia DAWSON, a minor, by and through her next friend and natural father, Robert E. Dawson; Robert E. Dawson, and Dale M. Dawson, husband and wife, Real Parties in Interest.

Nos. 1 CA–SA 90–220, 1 CA–SA 90–232.

Court of Appeals of Arizona, Division 1, Department E.

June 2, 1992.

Review Granted Feb. 2, 1993.

Jones, Skelton & Hochuli by Bruce D. Crawford, Lori A. Shipley and David C. Lewis, Phoenix, for petitioners Samaritan Foundation, Samaritan Health Services dba Good Samaritan Regional Medical Center, Cathey Milam Chester and Elaine Fraiz.

Weyl, Guyer, MacBan & Olson, P.A. by Thomas G. Bakker and Jolane D. Veeder, Phoenix, for petitioner Phoenix Children's Hosp., Inc.

Leonard & Clancy, P.C. by James J. Leonard, Jr. and Kenneth P. Clancy, Phoenix, for real parties in interest.

Bess & Dysart, P.C. by Brad K. Keogh and Timothy R. Hyland, Phoenix, for amici curiae Nat. Ass'n of Legal Assistants, Inc. and Affiliated Associations.

Lewis and Roca by Susan M. Freeman and Beth Schermer, Phoenix, for amicus curiae Arizona Hosp. Ass'n.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P.A. by Paul J. Giancola, Phoenix, for defendants Lawrence J. Koep, M.D., P.C., an Arizona corp. and Lawrence J. Koep.

## OPINION

FIDEL, Chief Judge.

In February of 1988, a child suffered a cardiac arrest in surgery and emerged revived but neurologically impaired. This special action arises from discovery disputes in the medical malpractice suit brought by the child and her parents against the hospital and two physicians.

Shortly after surgery, at the direction of the hospital's legal department, a nurse paralegal interviewed four operating room witnesses. The witnesses now claim at depositions to recall little or nothing of the event. Though the paralegal's summaries might refresh the witnesses' recollection, the hospital declines to provide these summaries to the witnesses or release them to plaintiffs' counsel.

Plaintiffs (real parties in interest) moved to compel disclosure. The hospital and its fellow petitioners responded that the summaries are absolutely protected by the attorney-client privilege and immune from discovery under the work product doctrine. The trial court ordered the summaries to be produced for inspection *in camera*, found only portions to be privileged, and ordered the remainder—"the functional equivalent of a witness statement"—disclosed.

In these consolidated special actions, the petitioners allege that the trial court abused its discretion. We take jurisdiction because issues of statewide importance are presented and because there is no adequate remedy by appeal. *Church of Jesus Christ of Latter–Day Saints v. Superior Court*, 159 Ariz. 24, 25–26, 764 P.2d 759, 760–61 (App.1988) ("When a trial court orders disclosure that a party or witness believes to be protected by a privilege, appeal provides no remedy. Special action is the proper means to seek relief.").

## FACTS AND PROCEDURE

Phoenix Children's Hospital ("PCH") is housed within Good Samaritan Regional Medical Center, which is owned and operated by Samaritan Health Services ("Samaritan"). PCH and Samaritan share some facilities and personnel, and, according to the affidavit of Samaritan's general counsel, the Samaritan Legal Department advises PCH and its employees "with regard to professional liability incidents and adverse patient occurrences."

In March 1988, anticipating litigation, petitioner Cathey Milam Chester, an attorney employed by Samaritan's Legal Department, directed an investigation of the incident that underlies this case. At Chester's direction, petitioner Elaine Fraiz, a Samaritan nurse paralegal, interviewed various witnesses to surgical and post-surgical events in the operating room and intensive care unit. This special action concerns Fraiz's interviews with four of those witnesses—three nurses and a scrub technician who were present in the operating

room during surgery.[1] Each witness signed a form consenting to representation by Samaritan if a claim were filed against her. The form directed the witness not to discuss the event without legal department approval except "1) with health care providers involved with continuing patient care; 2) with Peer Review Committees upon request;[2] and 3) [if required by the employee's participation as] a student ... in a formal SHS teaching program."

Fraiz summarized her interviews of the four witnesses in written memoranda, which were maintained by the legal department. When plaintiffs ultimately deposed the four witnesses, the witnesses claimed to recall little of the surgery and surrounding events. Yet petitioners declined to show them the interview summaries to refresh their recollection, as to do so would have waived whatever privilege might otherwise attach. *See Samaritan Health Servs., Inc. v. Superior Court,* 142 Ariz. 435, 438, 690 P.2d 154, 157 (App.1984).[3]

Plaintiffs' counsel, who had learned of the interview summaries through interrogatories and depositions, sought to depose Chester and Fraiz and subpoenaed documents relating to their investigation. Samaritan moved for a protective order, arguing that Chester and Fraiz knew only what they had learned through investigation and that the attorney-client privilege and work product rule shielded their investigative product from disclosure. As Samaritan was not a party, plaintiffs also moved that defendant PCH be compelled to produce the interview summaries, and PCH likewise asserted the attorney-client privilege and work product immunity in response.[4]

The trial court directed Samaritan and PCH to provide copies of the summaries for *in camera* review, but to

> line through on the summaries any and all material which constitutes matters of attorney opinion, attorney theory, attorney interpretation or attorney surmise. Those portions of the summaries which indicate the witnesses statements of what occurred during the operation ... shall be left without lines being drawn through.

The court indicated that it would extract from each summary and provide plaintiffs "the functional equivalent of a witness statement."

Upon receipt of the trial court's order, petitioners brought this consolidated special action and sought a stay, which this Court granted only in part. We directed the trial court to proceed with *in camera* inspection and designate what, if any, summary portions it intended to release. Petitioners' counsel were ordered to file under seal a copy of the summaries with this Court. Release of the designated portions to plaintiffs' counsel was stayed.

The trial court followed our directive, enabling us to review the proposed deletions by the trial court, and the trial court's finding that, without access to its designated portions, plaintiffs would be precluded from proving significant elements of their

---

1. Plaintiffs sought, and the trial court inspected, Fraiz's summaries of her interviews with two other witnesses, but the trial court limited discovery to portions of Fraiz's summaries of her interviews with the four witnesses whom we discuss.

2. Petitioners do not claim that the interview summaries were utilized for peer review purposes, and petitioners' counsel made clear to the trial court that they were not invoking a peer review privilege in this case.

3. In *Samaritan Health Services, Inc. v. Superior Court,* 142 Ariz. 435, 438, 690 P.2d 154, 157 (App.1984), this Court held under comparable circumstances that to allow witnesses to review interview summaries would waive any work product immunity or attorney-client privilege

and entitle opposing counsel to review the summaries. The plaintiffs allege, and Samaritan concedes, that after issuance of that decision, the practice of refreshing witnesses' recollection with summaries ceased.

4. Plaintiffs moved alternatively that the trial court shift the burden of proof to PCH on the negligent supervision claim. PCH argues peripherally that the trial court erred in hearing this motion jointly with the motions to compel and quash because the interview summaries do not relate to the negligent supervision claim. We reject this argument. The trial court surely has discretion, in administering its motion calendar, to decide which motions efficiently may be heard together. Moreover, the trial court denied plaintiffs' motion to shift the burden of proof.

case. The trial court commented that Samaritan, as soon as an incident is reported, signs up its "employees as 'clients' of the legal department of the hospital, does extensive interviews and summaries and thereby wraps this material in a mantle of peer review, attorney/client privilege and attorney work product." The court concluded that

> a reasonable reading of *Humana Hospital v. Superior Court*, 154 Ariz. 396, 742 P.2d 1382 ([App.] 1987) and *John C. Lincoln Hospital v. Superior Court*, 159 Ariz. 456, 768 P.2d 188 (App.1989) indicates the Court must provide reasonable alternatives.... Where plaintiffs' opportunity to prove [their] case is as effectively blocked as defendants' theories would claim in the fourteen motions before this Court, due process would seem to call for some form of remedy.

## I. WORK PRODUCT RULE

■ Petitioners argue that the trial court abused its discretion because the work product rule immunizes the interview summaries from discovery.[5]

Arizona's work product rule is embodied in Arizona Rule of Civil Procedure 26(b)(3), which provides qualified discovery immunity for material prepared in anticipation of litigation:

> [A] party may obtain discovery of documents ... otherwise discoverable[6] ... and prepared in anticipation of litigation or for trial by or for another party ... or for that other party's representative ... only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials

by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

The witness interview summaries that Elaine Fraiz prepared for Samaritan and PCH fall within the general ambit of Rule 26(b)(3). *See Longs Drug Stores v. Howe*, 134 Ariz. 424, 429, 657 P.2d 412, 417 (1983) (finding that summaries of witness interviews concerning an event that creates a substantial risk of legal exposure are documents prepared in anticipation of litigation).

The summaries contain to a limited degree the protected impressions of Ms. Fraiz; however, the trial court followed the approved process of *in camera* inspection and redaction to "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." *See* Ariz.R.Civ.P. 26(b)(3); *Longs Drug Stores*, 134 Ariz. at 430, 657 P.2d at 418 (Rule 26(b)(3) does not afford absolute protection to a document containing a mix of mental impressions and facts; if the trial court can separate the facts from protected impressions and the like, the court is free to determine whether the isolated facts should be disclosed.); *see also Samaritan*, 142 Ariz. at 438, 690 P.2d at 157 ("An *in camera* examination by the trial court can adequately strike the balance between a party's interest in discovering any evidence favorable to him and his opponent's interest in protecting the attorney-client relationship.").

*Federal Practice and Procedure* § 2210, at 621 (1970).

---

**5.** We preliminarily reject petitioner PCH's argument that it should not be compelled to produce the summaries because they are not in its "possession, custody or control." *See* Ariz.R.Civ.P. 34(a). PCH did not assert before the trial court that it lacked access to the documents. PCH was the client of the Samaritan Legal Department, and a party has control over a document if it has the legal right to obtain the document. *See* 8 Charles A. Wright & Arthur R. Miller,

**6.** Privileged documents are not "otherwise discoverable." Ariz.R.Civ.P. 26(b)(1). We analyze in Part II whether the interview summaries are protected by the attorney-client privilege. For purposes of work product analysis, however, we assume the summaries are "otherwise discoverable."

The question narrows to whether plaintiffs have shown, as Rule 26(b)(3) requires, substantial need for the redacted summaries and an inability to obtain their equivalent by other means. The trial court, whose grasp of the evidence surpasses ours, found that without the summaries, plaintiffs would be blocked from proving significant portions of their case.

Our dissenting colleague quarrels with this finding. Stepping outside our record on special action, he counts eighteen volumes in the superior court file, reports the number of depositions noticed in that file, and assumes that, in so intensely processed a case, equivalent information must be somehow available from some other source. Our colleague overlooks the fact that the trial judge who concluded otherwise has administered these extensive superior court proceedings. "[Our] standard of review is whether the trial court abused its discretion in determining that the requirements of Rule 26(b)(3) ha[ve] been met." *Longs Drug Stores*, 134 Ariz. at 429, 657 P.2d at 417. We have no warrant to usurp the trial court's role.

The record before us does not suggest that the trial court was derelict in applying the substantial need and unavailability standards to the materials tendered for review. To the contrary, the trial court denied plaintiffs two of Fraiz's witness summaries altogether, commenting, "there certainly was no smoking gun in there. There wasn't even a smoking match." The trial court ordered release of the remaining summaries only in carefully edited form.

One of these summaries—that of Fraiz's interview with operating nurse Kim Wilson—exemplifies what the trial court found to meet the criteria of Rule 26(b)(3). Wilson actively participated in the operating room response to the "code arrest." On March 16, 1988, according to Fraiz, Wilson explicitly detailed the effort to revive the child, describing the child's external appearance, the color and appearance of her internal organs, the actions and conversa-

tions of the operating room physicians and staff, the compressive techniques that they employed, the medications that they discussed and administered, and what the monitors showed. Wilson also compared this code response to others in her experience. At deposition in May of 1990, by contrast, Wilson's recollection was summarized in the following exchange:

Q: Anything else you remember specifically going on while you were present other than you helped with the supplies, you assisted with the code cart, you scrubbed up and gave whatever help they wanted at the surgical site? Anything else?

A: No. I don't remember anything other than that. That pretty much sums it up.

The other witnesses, like Wilson, remembered significantly less at deposition than when interviewed. A significant witness's inability to remember can constitute substantial need. *Klaiber v. Orzel*, 148 Ariz. 320, 323, 714 P.2d 813, 816 (1986); *see also Longs Drug Stores*, 134 Ariz. at 429, 657 P.2d at 417 ("[T]he trial court may order production upon a showing that the statements ... are unique because they were taken soon after the event."); 8 Wright & Miller, *supra*, § 2025, at 220 ("No one doubts that production should be ordered if the witness has a faulty memory and no longer remembers details of the event."). Here, by declining to make Fraiz's interview summaries available to Wilson and the other three witnesses, the petitioners effectively vetoed the possibility of refreshing their recollection. The trial court, by its order, attempted to overrule this veto so that the truth-finding process might profit from witnesses with refreshed recollection of critical moments of the case.[7]

We find no abuse of discretion. Because plaintiffs showed substantial need, and because the trial court took proper measures to protect the working impressions of Samaritan's legal staff, we hold that the trial

---

7. The question arises whether petitioners' counsel, as officers of the court, had an enforceable responsibility to the court and to the truth-finding process to make recollection-refreshing materials available to critical, but forgetful witnesses. This issue has not been briefed, however, so we merely note it without deciding it here.

court's order met the requirements of Rule 26(b)(3).

## II. ATTORNEY–CLIENT PRIVILEGE

Petitioners and amici argue that, even if work product immunity might yield to plaintiffs' evidentiary needs, the attorney-client privilege absolutely bars disclosure of communications by Samaritan or PCH employees to a member of Samaritan's legal staff. This argument poses several subordinate issues:

(1) Does the attorney-client privilege apply when, as here, the conduit of communications is a paralegal?

(2) Did the witnesses' acceptance of client status in Samaritan's interview consent forms oblige the court to accord them client status for purposes of the attorney-client privilege?

(3) Should Arizona law permit a corporate client to claim the attorney-client privilege for its lawyers' interviews with non-control group employees, and, if so, should the privilege be absolute or qualified?

We will discuss each of these issues in turn.

### A. Communications to a Paralegal

Arizona's attorney-client privilege statute provides that

an attorney shall not, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon in the course of professional employment. An attorney's *secretary, stenographer or clerk* shall not, without the consent of his employer, be examined concerning any fact the knowledge of which was acquired in such capacity.

Ariz.Rev.Stat.Ann. ("A.R.S.") § 12–2234 (1982) (emphasis added). Paralegals are not mentioned in the statute.

Plaintiffs argue that paralegals are an omitted and, therefore, unprotected conduit for attorney-client communications. *See Church of Jesus Christ*, 159 Ariz. at 29, 764 P.2d at 764 ("Privilege statutes, which impede the truth-finding function of the courts, are restrictively interpreted."). Al-

though we accept the precept of restrictive construction and will have more to say about it later in this opinion, we find plaintiffs' construction too restrictive in this instance.

In section 12–2234, our legislature recognized that lawyers often communicate with clients through agents. *See* Morris K. Udall et al., *Arizona Practice: Law of Evidence* § 74, at 139 (3d ed. 1991); *see also* 8 John H. Wigmore, *Evidence* § 2301, at 583 (John T. McNaughton rev., 1961) (The common law attorney-client privilege traditionally has included a client's communications to the attorney's representative.). We believe that the legislature intended by reference to "secretary, stenographer or clerk" to list a representative, not exclusive, group of agents through whom a lawyer and client might confidentially confer. *See* Udall et al., *supra*, § 74, at 139 ("In recognition of the fact that lawyers have employees who will hear or see confidential communications, at a minimum [section 12–2234] means that such communications do not become unprivileged when revealed to clerical employees hired by the lawyer to assist in furnishing legal advice.").

■ The law has recognized in other contexts that an attorney may properly and efficiently act through a paralegal. This Court, for example, has found paralegal services compensable in attorneys' fee awards, reasoning that lawyers should not devote time to tasks more economically assigned to legal assistants, "solely to permit that time to be compensable [in a fee award]." *Continental Townhouses East Unit One Ass'n v. Brockbank*, 152 Ariz. 537, 544, 733 P.2d 1120, 1127 (App.1986); *accord Missouri v. Jenkins ex rel. Agyei*, 491 U.S. 274, 288 & n. 10, 109 S.Ct. 2463, 2471 & n. 10, 105 L.Ed.2d 229 (1989). Similarly, lawyers should not retain information-gathering tasks more efficiently delegated to paralegals, solely to protect the client's privilege. We hold that a lawyer does not forfeit the attorney-client privilege by receiving otherwise privileged client communications through the conduit of a

properly supervised paralegal employee.[8]

■ We caution that this holding does not create an automatic "paralegal-client privilege." There may be circumstances in which a nominal paralegal serves an investigative function independent of the attorney-client relationship. *See Longs Drug Stores*, 134 Ariz. at 427–28, 657 P.2d at 415–16 (Communications to insurance investigators are not privileged, as they may be used by the investigator's insurance company employer for purposes other than securing legal advice for the insured.); *Butler v. Doyle*, 112 Ariz. 522, 525, 544 P.2d 204, 207 (1975) (Because insurance carriers may utilize statements received from their insureds for purposes independent of their insureds' legal representation, they are not agents of the attorneys hired to represent their insureds.). Such circumstances, however, are not established here.[9] Ms. Fraiz was an employee of Samaritan's Legal Department, acting solely at its direction, in anticipation of litigation against PCH. Her paralegal status did not strip the communications she received of whatever attorney-client privilege might otherwise attach.

### B. Client or Witness

We next consider what client may assert the privilege to protect the communications that Fraiz received. Like the trial court, we look beyond Samaritan's self-serving designation of each witness as a client. The trial court recognized the impediment to the truth-finding process if, simply by signing up an employee-witness as a client,

a corporation could "wrap[ ] this material in a mantle of … attorney/client privilege."

There is no indication in the record that the interviewees sought, needed, or received personal legal advice. They were merely employees to whom the corporation had ready access to gather facts. Essence, not label, controls; the interviewees were witnesses, not clients, in this case.

We recognize, however, that a corporation's lawyers must sometimes seek facts from corporate employees in order to "give sound and informed advice" to the corporate client. *See Upjohn Co. v. United States*, 449 U.S. 383, 390, 101 S.Ct. 677, 683, 66 L.Ed.2d 584 (1981). We therefore consider whether PCH and Samaritan may assert a corporate attorney-client privilege to protect their lawyers' gathering of facts from corporate employees.

### C. Attorney–Client Privilege and the Corporate Client

■ No recorded Arizona case has yet applied the attorney-client privilege to communications between a corporation and its lawyer. *See* Udall et al., *supra*, § 74, at 138–39. However, Arizona's attorney-client privilege statute, A.R.S. § 12–2234, does not exclude the corporate client. Nor would such an exclusion fit the privilege's supporting rationale. Udall writes, "[t]he purpose of the privilege is to encourage candor by the client so that the lawyer's advice will be based on reliable information." *Id.* § 74, at 136; *see also State v.*

---

8. An attorney is ethically responsible for the conduct of a nonlawyer employed by, retained by, or associated with the lawyer. 17A A.R.S.Sup.Ct.Rules, Rules of Professional Conduct, Rule 42, ER 5.3 (1988). The Rules of Professional Conduct require the lawyer with direct supervisory control over the nonlawyer to "make reasonable efforts to ensure that the [nonlawyer's] conduct is compatible with the professional obligations of the lawyer." *Id.* Those obligations include client confidentiality. *Id.* ER 5.3 cmt.

9. Plaintiffs argue that the Fraiz investigation was not done to enable the Samaritan Legal Department to advise Samaritan or PCH. They assert that in matters of this kind, the legal department functions merely as a risk manage-

ment department and "dispenses no legal advice—it simply marshals and memorializes the facts for use by outside counsel retained in the event litigation does ensue." Citing *State ex rel. Corbin v. Weaver*, 140 Ariz. 123, 680 P.2d 833 (App.1984), plaintiffs urge us to conclude that no attorney-client privilege attaches to this merely investigative, non-advisory process.

This fact-intensive argument was neither the subject of an evidentiary hearing nor the subject of specific trial court findings. Nor did the trial court resolve the issues on this basis. Accordingly, we neither accept nor reject this argument. Rather, we assume for purposes of decision that the Fraiz investigation was undertaken to enable the legal department to advise its corporate client.

*Holsinger*, 124 Ariz. 18, 22, 601 P.2d 1054, 1058 (1979). Because lawyer-client candor is important in corporate, as in individual, representation, we hold that an attorney-client privilege is available to corporations under Arizona law.

To define the proper scope of that privilege poses harder questions. Who speaks confidentially for the corporate client? Does the privilege attach to every communication funnelled to the corporate lawyer from a corporate employee? Does the privilege need to extend so far to meet the purpose of promoting well-informed legal advice? Within a large corporate client, information useful to the lawyer may be scattered among many employees at various corporate tiers. Some employees, at the policy-making or advisory level, will participate in formulating the corporate response to legal advice. Others, like the nurses in this case, are mere eyewitnesses whose observations the lawyers and corporate decision-makers seek to discover, as they would the observations of any eyewitness, corporate employee or not. Courts and commentators, sensing a qualitative difference, have struggled to define a corporate privilege broad enough to promote the flow of lawyer-client communications, but not so broad as to block external access to internal corporate witnesses and facts. As the Supreme Court of Illinois explained:

> The purpose of the attorney-client privilege is to encourage and promote full and frank consultation between a client and legal advisor by removing the fear of compelled disclosure of information.... Under some circumstances, however, the privilege poses an absolute bar to the discovery of relevant and material evidentiary facts, and in the corporate context, given the large number of employees, frequent dealings with lawyers and masses of documents, the "zone of silence grows large." ... That result, in our judgment, is fundamentally incompatible with this State's broad discovery policies looking to the ultimate ascertainment of the truth ..., which we continue to find essential to the fair disposition of a lawsuit.... Its potential to insulate so much material from the truth-seeking process convinces us that the privilege ought to be limited for the corporate client to the extent reasonably necessary to achieve its purpose.

*Consolidation Coal Co. v. Bucyrus–Erie Co.*, 89 Ill.2d 103, 59 Ill.Dec. 666, 672–73, 432 N.E.2d 250, 256–57 (1982) (citations omitted).

The Supreme Court of Illinois resolved this dilemma by adopting a corporate attorney-client privilege but limiting the privilege to communications with "control group" employees—those who personify the corporation by their managerial or advisory authority to shape corporate decisions in response to the corporate lawyer's advice. *Id.* 59 Ill.Dec. at 673–74, 432 N.E.2d at 257–58; see also *City of Philadelphia v. Westinghouse Elec. Corp.*, 210 F.Supp. 483, 485 (E.D.Pa.), *petition for mandamus and prohibition denied sub nom. General Elec. Co. v. Kirkpatrick*, 312 F.2d 742 (3d Cir.1962), *cert. denied*, 372 U.S. 943, 83 S.Ct. 937, 9 L.Ed.2d 969 (1963).

The Illinois Supreme Court's approach in *Consolidation Coal* is helpful to our effort to determine the proper scope of the corporate privilege in Arizona. Before discussing that case further, however, we examine the United States Supreme Court's very different approach in *Upjohn*, 449 U.S. 383, 101 S.Ct. at 679, a case favored by petitioners and the dissent. There, one year before *Consolidation Coal*, the Supreme Court rejected the control group test for the federal courts, finding it inadequate to protect the flow "of information to the lawyer to enable him to give sound and informed advice." *Id.* at 390, 101 S.Ct. at 683.

*1. An Examination of Upjohn:*

In *Upjohn*, corporate counsel had conducted an internal investigation to determine whether corporate employees had bribed foreign officials. The Internal Revenue Service ("I.R.S.") later sought Upjohn's investigative product, including the lawyers' interview memoranda and notes. The Sixth Circuit held the attorney-client privilege inapplicable to communications by non-control group employees "for the sim-

ple reason that the communications were not the 'client's.' " *Id.* at 388, 101 S.Ct. at 682. The Supreme Court reversed, refusing to restrict the attorney-client privilege to the corporate managerial or policy-making tier. The Court explained:

Middle-level—and indeed lower-level—employees can, by actions within the scope of their employment, embroil the corporation in serious legal difficulties, and it is only natural that these employees would have the relevant information needed by corporate counsel if he is adequately to advise the client with respect to such actual or potential difficulties.

*Id.* at 391, 101 S.Ct. at 683.

Petitioners urge us to draw from *Upjohn* an expansive rule of privilege for the Arizona courts. Petitioners argue, and the dissent apparently agrees, that the privilege should cover whatever fact-finding a corporation's legal staff undertakes from any corporate employee as long as the employee's communications are sought in anticipation of litigation or to enable the lawyer to formulate informed legal advice. We decline to adopt so broad a rule.

First, *Upjohn* does not bind the state courts; it establishes federal evidentiary, not constitutional, law, and we need follow it only to the extent we find it persuasive. *See* Udall et al., *supra,* § 74, at 138–39; *see also Consolidation Coal,* 59 Ill.Dec. at 672–73, 432 N.E.2d at 256–57 (rejecting *Upjohn* as preserving too broad a corporate "zone of silence" in frustration of the state's "discovery policies looking to the ultimate ascertainment of the truth").

Second, evidence scholars have not found *Upjohn* persuasive. One study describes it as "an opinion largely characterized by unexplicated conclusory language." John E. Sexton, *A Post–*Upjohn *Consideration of the Corporate Attorney–Client Privilege,* 57 N.Y.U.L.Rev. 443, 444 (1982). Another criticizes the Court for overstating the investigative benefits of the attorney-client privilege in the corporate context and for ignoring

the special costs inherent in applying the privilege to corporations. One such ignored cost is that the corporation is more likely than an individual client to manipulate the privilege to conceal information used for nonlegal purposes.... An expansive attorney-corporate client client privilege may encourage corporations to conduct legal investigations into the details of any potentially embarrassing incident, not as a result of legal need, but because of the secrecy the privilege provides to business decisions.

Michael L. Waldman, *Beyond* Upjohn: *The Attorney–Client Privilege in the Corporate Context,* 28 Wm. & Mary L.Rev. 473, 493–94 (1987) (footnote omitted); *see also* 24 Charles Alan Wright & Kenneth W. Graham, Jr., 24 *Federal Practice and Procedure* § 5476, at 144–49 (1986) (criticizing on similar grounds "the Supreme Court's flawed vision of the privilege and the world in which it must be applied"); Vincent C. Alexander, *The Corporate Attorney– Client Privilege: A Study of the Participants,* 63 St. John's L.Rev. 191, 381 (reasoning that *Upjohn* applies the privilege more broadly than is logically, practically, or empirically required to meet the investigatory needs of corporate counsel); Stephen A. Saltzburg, *Corporate and Related Attorney–Client Privilege Claims: A Suggested Approach,* 12 Hofstra L.Rev. 279 (1984); Note, *The Supreme Court 1980 Term,* 95 Harv.L.Rev. 91, 273 (1981) [hereinafter *1980 Term* ].

Third, behind *Upjohn* 's broad language lies a narrow, fact-specific, holding. *See* Alexander, *supra,* at 378–79. Although Chief Justice Burger, in a separate concurrence, urged the Court to articulate a standard to guide future cases,[10] the remaining justices expressly declined to do so, stating:

---

**10.** Chief Justice Burger proposed, but the Court declined to adopt, a standard much like that the petitioners contend for in this case. He wrote "in my view the Court should make clear now that, as a general rule, a communication is privileged at least when, as here, an employee or former employee speaks at the direction of

the management with an attorney regarding conduct or proposed conduct within the scope of employment. The attorney must be one authorized by the management to inquire into the subject and must be seeking information to assist counsel in performing any of the following functions: (a) evaluating whether the employ-

[W]e decide only the case before us, and do not undertake to draft a set of rules which should govern challenges to investigatory subpoenas. Any such approach would violate the spirit of Federal Rule of Evidence 501. See S.Rep. No. 93–1277, p. 13 (1974) ("the recognition of a privilege based on a confidential relationship ... should be determined on a case-by-case basis").

449 U.S. at 396, 101 S.Ct. at 686.

In a later decision, the Supreme Court reiterated the fact-specific confines of *Upjohn*, stating "we [there] considered whether the privilege covers only communications between counsel and top management, and decided that, *under certain circumstances*, communications between counsel and lower-level employees are also covered." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348, 105 S.Ct. 1986, 1991, 85 L.Ed.2d 372 (1985) (emphasis added). This is no charter for the blanket rule favored by petitioners and the dissent.

If *Upjohn* is indeed confined to its facts, the most salient is the I.R.S.'s failure to show that it could not obtain the information that it sought through alternative, less intrusive means. The Court observed that Upjohn had turned over a list of the employees in question and that the I.R.S. already had interviewed twenty-five of them. 449 U.S. at 396, 101 S.Ct. at 686. The Court did not analyze *Upjohn* as a case in which application of the privilege would *block* the adversary's or factfinder's ultimate access to essential employee-witnesses, but merely as a case in which the adversary would be put to the *inconvenience* of developing their evidence on its own.

While it would probably be more convenient for the Government to secure the results of petitioner's internal investigation by simply subpoenaing the questionnaires and notes taken by petitioner's attorneys, such considerations of convenience do not overcome the policies served by the attorney-client privilege.

*Id.* This case is far different, and we cannot do it justice by dislodging *Upjohn*'s broadest pronouncements from their factual context and accepting them indiscriminately here.

### 2. Some Arizona Precepts and the Illinois Approach:

To shape a rule to fit this case and guide similar cases in the future, we return to some fundamental tenets of Arizona's evidentiary privilege jurisprudence. First is the limited purpose of the attorney-client privilege—to encourage client candor so that the lawyer may give well-informed advice. Udall et al., *supra*, § 74, at 136. Our supreme court has written, significantly, that this purpose is accepted in Arizona "not to protect the client, but to ... promote the administration of justice." *Holsinger*, 124 Ariz. at 22, 601 P.2d at 1058.

The administration of justice also depends, however, on ascertainment of the truth. Accordingly, the Arizona courts have adhered to the tenet of narrow construction. *See, e.g., Church of Jesus Christ*, 159 Ariz. at 29, 764 P.2d at 764 (quoting Morris K. Udall & Joseph M. Livermore, *Arizona Practice: Law of Evidence* § 71, at 123–24 (2d ed. 1982) (" '[P]rivileges, being in derogation of the truth, are to be strictly construed.' Exceptions are few and narrow to the proposition that 'the public ... has a right to every [person's] evidence.' ")); *see also* 8 Wigmore, *supra*, § 2291, at 554 (The benefits of the attorney-client privilege "are all indirect and speculative; its obstruction is plain and concrete.... It ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.") (footnote omitted).

The Supreme Court of Illinois, reasoning from these same premises, sought a rule that would adequately promote consultation between lawyer and corporate client without unduly frustrating the truth-seeking process of the courts. *Consolidation*

---

ee's conduct has bound or would bind the corporation; (b) assessing the legal consequences, if any, of that conduct; or (c) formulating appropriate legal responses to actions that have

been or may be taken by others with regard to that conduct." 449 U.S. at 402–03, 101 S.Ct. at 689 (Burger, C.J., concurring).

*Coal,* 89 Ill.Dec. at 673, 432 N.E.2d at 257. The court concluded that the control group test "strike[s] a reasonable balance" toward that end. *Id.* Although one year earlier the United States Supreme Court had criticized that test as unpredictable in *Upjohn,* 449 U.S. at 393, 101 S.Ct. at 684, the lower Illinois courts had been using the test for nineteen years,[11] and the Illinois Supreme Court applauded its "predictability and ease of application." *Consolidation Coal,* 89 Ill.Dec. at 673, 432 N.E.2d at 257. Other courts and commentators have found the same. *See In re Grand Jury Investigation,* 599 F.2d 1224, 1235 (3d Cir. 1979) (The test "draws as bright a line as any of the proposed approaches."); Note, *Attorney–Client Privilege for Corporate Clients: The Control Group Test,* 84 Harv.L.Rev. 424, 430 (1970) ("[T]he test provides an easily applicable bright-line rule to facilitate judicial decisionmaking.").[12]

The Illinois Supreme Court defined the control group to include not only top managerial decision-makers, but also those with pertinent advisory responsibility:

> We believe that an employee whose advisory role to top management in a particular area is such that a decision would not normally be made without his advice or opinion, and whose opinion in fact forms the basis of any final decision by those with actual authority, is properly within the control group. However, the individuals upon whom he may rely for supplying information are not members of the control group. Thus, if an employee of the status described is consulted for the purpose of determining what legal action the corporation will pursue, his communication is protected from disclosure.

*Consolidation Coal,* 89 Ill.Dec. at 674, 432 N.E.2d at 258.

By confining the attorney-client privilege to control group communications, the court left lawyers' communications beyond the control group to whatever protection the work product rule might afford. With one reservation, which we will come to shortly, we find considerable merit in this approach.

First, as Udall points out:

> [B]eyond the control group, what is really being protected are the statements of witnesses who become clients solely because of the happenstance of employment by the corporate client.

Udall et al., *supra,* § 74, at 139. The dissent maintains that lawyers will not interview such witnesses without an unqualified attorney-client privilege. Yet lawyers, when representing corporate clients, frequently gather information from witnesses beyond the corporate sphere, even though such communications, however vital to sound advice, are not subject to the attorney-client privilege, but to the more flexible protection of the work product rule. We see no reason why Udall's "happenstance of employment" should require a more rigid form of protection for routine witness interviews within the corporate sphere. Udall adds:

> While one can understand a lawyer's desire to keep everything concerning his client's case secret, that function has traditionally been performed by the work product doctrine, prohibiting discovery of trial preparation materials absent a showing of special need, rather than the attorney-client privilege which is an absolute bar to discovery.

**11.** *See Day v. Illinois Power Co.,* 50 Ill.App.2d 52, 199 N.E.2d 802, 806 (1964) (first adopting control group test for Illinois courts); *Johnson v. Frontier Ford, Inc.,* 68 Ill.App.3d 315, 24 Ill.Dec. 908, 911, 386 N.E.2d 112, 115 (1979) (applying test); *Shere v. Marshall Field & Co.,* 26 Ill. App.3d 728, 327 N.E.2d 92, 94 (1974) (same); *Golminas v. Fred Teitelbaum Constr. Co.,* 112 Ill.App.2d 445, 251 N.E.2d 314, 317 (1969) (same).

**12.** One study criticizes as "highly suspect" the United States Supreme Court's assertion—illustrated by reference to two federal district court cases—that the control group test is unpredictable. Waldman, *supra,* 28 Wm. & Mary L.Rev. at 498–99. Waldman explains further: "Two cases seem flimsy evidence on which to indict a test that had been applied countless times over twenty years. More significantly, the Court also failed to understand that these two decisions may well be consistent.... The 'disparate decisions' may have been in fact the correct and predictable results of applying the control group test to the different organizational structures of different corporations." *Id.*

*Id.* at 140; *see also* Saltzburg, *supra,* at 303 ("[T]he premise of the nonabsolute character of the work product doctrine is that lawyers who need information to provide legal advice will seek it from knowledgeable witnesses, even without an absolute privilege protecting their work.").

Further, empirical research suggests that, beyond the control group, an absolute privilege is unnecessary to encourage candid communications between employee witnesses and the corporation's lawyer. *See* Alexander, *supra,* at 381 (reporting that nearly two-thirds of a surveyed group of corporate lawyers agreed that a qualified privilege—one surmountable, like work product immunity, upon a showing of special need—would not diminish the candor of non-control group employees); *see also 1980 Term, supra,* at 276–77 ("[I]n seeking legal advice on future corporate moves, the corporation, ... [even] without the privilege, [has] little incentive to withhold relevant information from an attorney. Similarly, investigations of past corporate behavior ... would continue even in the absence of the privilege—although they might be performed by someone other than the attorney—because corporate management needs the information to correct past inefficiencies [and] to reward and reprimand employees....").

These reasons lead us to join the Illinois Supreme Court in concluding against extending an unqualified attorney-client privilege to non-control group employees. We recognize, as did the Supreme Court in *Upjohn,* that such employees may have information material to a lawyer who wishes to properly advise the corporate client. This insight warrants some discovery protection, but does not compel Arizona to define that protection in absolute terms that preclude practical accommodation.

### 3. Work Product Immunity or Qualified Privilege:

We have one reservation, however, about leaving non-control group communications wholly to the protection of the work product rule. Work product protection is traditionally confined to lawyers' efforts in an-ticipation of litigation, whereas corporations seek legal advice on a broad range of matters, in many of which the litigation prospect is remote. Timely and informed legal advice may enhance corporate compliance with the law and prevent later litigation. We believe that the flow of information from the corporation to its lawyer should be promoted whenever useful to this advisory role, and not confined to instances where litigation is in view. The work product rule falls short of this mark.

■ We meet this concern, however, by importing the familiar discovery hurdles of the work product rule into a *qualified* attorney-client privilege for communications with non-control group members. *See* Alexander, *supra,* at 377–81 (proposing a qualified privilege—a privilege surmountable in limited circumstances of special need—to achieve the right balance of protection for non-control group members); 24 Wright & Graham, *supra,* § 5476, at 191 (same). This qualified privilege includes the following elements:

a. The qualified privilege applies when management, in order to secure legal advice or assistance for the corporation, directs a corporate employee outside the control group to communicate in confidence with the corporation's legal staff about matters within the scope of employment.

b. Unlike work product immunity, the privilege does not require a showing that the communication was undertaken in anticipation of or preparation for litigation.

c. Like work product immunity, however, the qualified privilege may be overcome "upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Ariz.R.Civ.P. 26(b)(3); *see also* Alexander, *supra,* at 401 (proposing that these requirements for overcoming work product immunity be adopted as requirements for overcoming the qualified privilege for non-control group communications).

d. Additionally, to overcome the privilege, the party seeking discovery must

demonstrate that its substantial need outweighs the corporation's interest in maintaining confidentiality. Alexander, *supra*, at 391–400.

We appreciate that the notion of a qualified attorney-client privilege is unfamiliar. At the root of much discussion lies the all-or-nothing assumption that the attorney-client privilege, if recognized at all, must wholly trump any competing interest of an adversary or the court.[13] Yet courts have begun to recognize that certain circumstances may warrant a more flexible approach.[14] And in Arizona, where we must advance the law of privilege along lines of reason and experience,[15] we should hesitate to define new areas of privilege in absolute terms if the purposes of privilege may be served adequately by a more flexible rule.

We opt for flexibility in this case. We attempt, by adopting a qualified privilege for lawyers' communications with non-control group employees, to reconcile, without needlessly subordinating one objective to the other, our law's commitment to full client disclosure and its commitment to full adjudicative access to the facts.

Our rule, like the work product rule, requires the trial court to prudently evaluate claims of substantial need and unavailability. The dissent chooses to attack these standards as too pliant to provide meaningful protection. Yet these are case-hardened standards, long familiar to the courts, imported directly from a rule drafted expressly to "give[ ] strong protection to work product." Ariz.R.Civ.P. 26(b) State Bar Committee note (1970 amendment); *see also* Alexander, *supra*, at 386 ("Experience under the work product doctrine suggests that adversaries are seldom capable of making the necessary showing that they are unable to obtain the evidence they need from nonprivileged sources."). We believe that these criteria should place a heavy burden on those who seek discovery and adequately bolster already ample corporate

---

13. An example is *Admiral Insurance Co. v. United States District Court*, 881 F.2d 1486 (9th Cir. 1989), where the court unnecessarily defined the privilege in absolute terms to resolve an issue it might have decided on narrower grounds. There, lawyers preparing to defend the corporation against civil fraud and RICO allegations interviewed the two corporate officers most knowledgeable about the challenged transactions. The officers consented to be interviewed when assured that their disclosures would be treated as privileged communications by the corporate client. The officers subsequently resigned and, in the course of discovery, informed plaintiffs that they would invoke the Fifth Amendment at deposition. The trial court ordered disclosure of their transcribed interviews, finding that their evidence was essential and unavailable from any other source. The Ninth Circuit reversed, rejecting the argument that the attorney-client privilege should ever be subject to an unavailability exception. *Id.* at 1488. We decline to follow *Admiral* for two reasons. First, the officers when interviewed were undoubtedly control group members. Proponents of a qualified privilege beyond the control group have acknowledged that an absolute privilege may be necessary to assure a proper flow of communications within the control group sphere. *See* 24 Wright & Graham, *supra*, § 5476, at 191; Alexander, *supra*, at 380 & n. 647. Second, the officers' later assertion of the Fifth Amendment suggests that if they had not been assured the privilege, they would not have disclosed their knowledge to the corporation's lawyers at all. The *Admiral* court did not exam-

ine whether that exigency, even under qualified privilege analysis, might outweigh the adversary's evidentiary need.

14. *See, e.g., Garner v. Wolfinbarger*, 430 F.2d 1093, 1103–04 (5th Cir.1970), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971) (finding that the privilege may be overcome by a showing of good cause in shareholder derivative suits); *Aguinaga v. John Morrell & Co.*, 112 F.R.D. 671, 681 (D.C.Kan.1986) (holding that the privilege may be overcome by a showing of good cause in the effort by union members to discover communications between lawyers and officers who allegedly betrayed union); *Royal Embassy of Saudi Arabia v. Steamship Mount Dirfys*, 537 F.Supp. 55, 56 (E.D.N.C.1981) (explaining that communications covered by the attorney-client privilege may be "subject to disclosure only upon a showing of truly substantial need and undue hardship"); *United Jersey Bank v. Wolosoff*, 196 N.J.Super. 553, 483 A.2d 821, 827 (App.Div.1984) (explaining that the party seeking disclosure must show that material evidence "cannot be secured from any less intrusive source").

15. Rule 501 of the Arizona Rules of Evidence provides, "[e]xcept as otherwise required by the Constitution of the United States, the Constitution of Arizona, or by applicable statute or rule, privilege shall be governed by the principles of the common law as they may be interpreted in light of reason and experience, or as they have been held to apply in former decisions."

incentives to provide legal advisers access to material facts.[16] *See* Saltzburg, *supra*, at 303 (explaining that corporations have practical incentives, even without the attorney-client privilege, to assure their lawyers sufficient access to the facts to provide well-informed advice).

### D. Application of the Privilege

■ Because the trial court invoked due process in its ruling, we point out that we do not. This area of law requires flexibility, not the increased calcification that would follow a ruling on constitutional grounds. In other respects, however, we conclude that the trial court properly approached and resolved the privilege question: First, as stated earlier in this opinion, the trial court reasonably found that plaintiffs had proven substantial need and the unavailability of equivalent evidence from non-privileged sources. Second, the trial court reasonably found that petitioners' confidentiality interests could be protected adequately through a process of redaction and *in camera* review. Third, after extending such protection, the trial court properly treated the petitioners' privilege as a qualified privilege that had been overcome.

### CONCLUSION

Although the interview summaries are protected by both the work product doctrine and by a qualified attorney-client privilege, plaintiffs have made the requisite showing that their need for disclosure outweighs the corporation's interest in confidentiality. Because the trial court did not abuse its discretion in ordering limited dis-

closure, the relief that petitioners have requested is denied.

CLABORNE, J., concurs.

VOSS, Presiding Judge, dissenting.

It is best to first recognize the portions of the majority decision with which I agree. The majority concludes, and I agree, that because candid exchanges between attorney and client play a necessary part in corporate representation, the "attorney-client privilege is available to corporations under Arizona law." Further, that Ms. Fraiz was factually qualified as a paralegal to Samaritan's Legal Department and the fact that she conducted the interviews and wrote the subjective reports does not deprive the communications of the attorney-client privilege. I disagree, however, with the majority's bifurcation of the classification of corporate employees between control and non-control groups and the qualification of the privilege attaching to the latter. I further disagree, assuming for argument a "qualified privilege" "substantial need" analysis applies, that the trial court or this court had the record before it to make any such evaluation.

The result reached by the majority creates a confusing hybrid where the absolute privilege for factual communications to corporation lawyers by control group employees is protected, but is qualified for non-control group members. While acknowledging that the notion of a qualified attorney-client privilege is "unfamiliar," the majority opts for "a more flexible rule," involving such motion-prolific terms as "substantial need," "undue hardship," and "substantial equivalent." Beyond opening the door for future argument in virtually every case as to what is a "control" or "non-control" group,[17] the qualification de-

---

**16.** The dissent asserts that the application of a qualified privilege in a hospital setting will cause hospitals to suspend in-house investigations. The majority disagrees for the reasons stated above. We also point out, however, lest our opinion be read more broadly than intended, that the discovery rule that we articulate does not apply to materials gathered solely for peer review. *See* A.R.S. § 36–441 (Supp.1991); *see also John C. Lincoln Hosp. v. Superior Court*, 159 Ariz. 456, 459, 768 P.2d 188, 191 (App.1989).

**17.** The very terms of the test ... suggest the unpredictability of its application. The test [of what is a control group] restricts the availability of the privilege to those officers who play a 'substantial role' in deciding and directing a corporation's legal response. Disparate decisions in cases applying this test illustrate its unpredictability. *Compare, e.g., Hogan v. Zletz,* 43 F.R.D. 308, 315–316 (ND Okl.1967), aff'd in part *sub nom. Natta v. Hogan,* 392 F.2d 686 (CA 10 1968) (control group includes managers and assistant managers of patent

scribed by the majority is incongruous for defining the parameters of the attorney-client privilege because the broad language and discretion granted the trial judge places corporate counsel in the untenable position of being unable to rely on the confidentiality of in-house information gathering and ignores the admitted need for such an availability. The majority acknowledges the need for and existence of the privilege and then destroys its practical availability by introducing uncertainty. The United States Supreme Court recognized this problem when it stated that "[a]n uncertain privilege ... is little better than no privilege at all." *Upjohn Co. v. United States*, 449 U.S. 383, 393, 101 S.Ct. 677, 684, 66 L.Ed.2d 584 (1981).

*Upjohn* involved the precise issue before this court and in a unanimous [18] decision extended the attorney-client privilege to corporations and refused to recognize the so-called control group test.[19] Before deciding the issue, the Court described the importance of the attorney-client privilege:

> The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law. 8 J. Wigmore, Evidence § 2290 (McNaughton rev. 1961). Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.... [I]n *Fisher v. United States*, 425 U.S. 391,

403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976), we recognized the purpose of the privilege to be "to encourage clients to make full disclosure to their attorneys." This rationale for the privilege has long been recognized by the Court, see *Hunt v. Blackburn*, 128 U.S. 464, 470, 9 S.Ct. 125, 127, 32 L.Ed. 488 (1888) (privilege is "founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure").

*Id.* 449 U.S. at 389, 101 S.Ct. at 682.

In *Upjohn*, management became aware of alleged irregularities in payments to foreign government officials to secure government business. The chairman of the board ordered corporate counsel to conduct an investigation for the purpose of determining the nature of any such payments. Managers and employees were interviewed or sent questionnaires and were advised to treat the material as confidential. Corporate counsel prepared notes and memoranda relative to the interviews and questionnaire results. Within seventeen months of the chairman's request to develop the information, the I.R.S., in an effort to determine the tax consequences of the payments, asked the district court to compel production of the material after the corporation had declined to do so. *Id.* at 386–88, 101 S.Ct. at 681–82.

Here, on February 2, 1988, the young daughter of a physician suffered cardiac

---

division and research and development department), with *Congoleum Industries, Inc. v. GAF Corp.*, 49 F.R.D. 82, 83–85 (ED Pa.1969), aff'd, 478 F.2d 1398 (CA3 1973) (control group includes only division and corporate vice presidents, and not two directors of research and vice president for production and research).
*Upjohn*, 449 U.S. at 393, 101 S.Ct. at 684.

**18.** Chief Justice Burger filed a concurring opinion but "agree[d] fully with the Court's rejection of the so-called 'control group' test, its reasons for doing so, and its ultimate holding that the communications at issue are privileged." *Id.* at 402, 101 S.Ct. at 689.

**19.** *Id.* at 397, 101 S.Ct. at 686. Citing *Upjohn*, the California Court of Appeal in *Bobele v. Superior Court*, 199 Cal.App.3d 708, 245 Cal.Rptr. 144 (1988), reaffirmed that "[t]he attorney-client privilege applies to corporations," *id.* 245 Cal. Rptr. at 146, and recognized the "need to insure that privileged communications *remain privileged*." *Id.* at 148 (emphasis added). Other cases adopting the reasoning of *Upjohn* are *Sullivan v. Fairmont Homes, Inc.*, 543 N.E.2d 1130, 1134 (Ind.App.1989), and *SICPA North Am. v. Donaldson Enters., Inc.*, 179 N.J.Super. 56, 430 A.2d 262, 264 (Law Div.1981).

arrest during surgery resulting in substantial impairment. On February 8, 1988, Samaritan's in-house counsel received notice of the occurrence. Indisputably in anticipation of litigation,[20] Blair D. Benjamin, general counsel, directed attorney Chester to investigate the incident in order to provide legal advice to Samaritan.[21] Ms. Chester instructed Ms. Fraiz, a nurse paralegal employed by Samaritan in its legal department, to interview employees involved in the occurrence. The employees were interviewed in March of 1988, and were advised that the interviews were confidential. Notes were taken of the interviews, and Ms. Fraiz then prepared memoranda directed to general counsel and intended for the use of Mr. Benjamin and Ms. Chester in rendering legal opinions to Samaritan. The documents were maintained as confidential attorney-client records. Two years after the incident, plaintiffs' counsel demanded the production of the memoranda, and Samaritan refused, citing the attorney-client privilege.

In this case, as in *Upjohn*, the

communications at issue were made by [petitioner's] employees to counsel for [petitioner] acting as such, at the direction of corporate superiors in order to secure legal advice from counsel.... Information not available from upper-echelon management, was needed to supply a basis for legal advice concerning ... potential litigation.... The communications concerned matters within the scope of the employees' corporate duties, and the employees themselves were sufficiently aware that they were being questioned in order that the corporation could obtain legal advice.

*Id.* at 394, 101 S.Ct. at 685 (footnotes omitted).

The law evaluated by *Upjohn* is also substantively the same. "Federal Rule of Evidence 501 provides that 'the privilege of a witness ... shall be governed by the principles of the common law as they may be interpreted by the courts ... in light of reason and experience.'" *Id.* at 389, 101 S.Ct. at 682. Rule 501, Arizona Rules of Evidence, provides that "privilege shall be governed by the principles of the common law as they may be interpreted in light of reason and experience, *or as they have been held to apply in former decisions*" (emphasis added). Section 12–2234 of our statutes provides no qualification; it prohibits an examination "as to any communication made by the client" to his attorney. The Arizona Supreme Court has recognized *"that privileged material is not discoverable." Butler v. Doyle*, 112 Ariz. 522, 524, 544 P.2d 204, 206 (1975) (emphasis added).

The trial court, and apparently the majority, are concerned about Samaritan, which is not a party to the litigation, "throw[ing] a blanket" over the case. This concern was considered and rejected by the *Upjohn* court.

The Court of Appeals declined to extend the attorney-client privilege beyond the limits of the control group test for fear that doing so would entail severe burdens on discovery and create a broad "zone of silence" over corporate affairs. Application of the attorney-client privilege to communications such as those involved here, however, puts the adversary in no worse position than if the communications had never taken place. The privilege only protects disclosure of communications; *it does not protect disclosure of the underlying facts* by those who communicated with the attorney[.]

449 U.S. at 395, 101 S.Ct. at 685 (emphasis added).

Samaritan's concern was confirmed as counsel for plaintiff had hand delivered on March 30, 1988, a letter demanding copies of all records concerning the admission and treatment of the plaintiff.

**20.** The trial judge understood the need for the contact:

MR. CRAWFORD: These basic foundational matters have not been contradicted by the plaintiffs, that Kathy [sic] Chester directed a paralegal in the legal department to interview these people for her because the hospital felt there was a reasonable possibility they might get sued. That's not contradicted.

THE COURT: I agree with that.

**21.** Samaritan is not a party to the underlying litigation, but became involved through its objections to plaintiffs' discovery efforts.

The majority also asserts that the qualification of the privilege for non-control employees will not have any substantial impact on the privilege. I disagree. The qualified privilege created by the majority will be construed as an uncertain one because it is broadly defined, and review of its application is subject only to the wide parameters of the abuse of discretion standard.

Here, the wide latitude taken by the trial judge is manifest. While acknowledging the existence of the attorney-client privilege relative to the material, the trial judge wanted, through redaction, to reduce the client interview summaries to "the functional equivalent of a witness statement." In articulating the justification, the court stated: "[T]his seems to me to be a reasonable solution to provide information so that these witnesses who don't remember everything can have this information." The court characterized the material as nothing more than "past recollection recorded." The trial judge, in his September 25, 1990 order, alluded to the "rights" of the witnesses and the plaintiffs. "The witnesses have a *right* to have those memories refreshed, and plaintiffs' have a *right* to see their recollections which were recorded on or about the times of the incident." (Emphasis added.) Such an approach—if the witnesses need interview summaries to refresh their recollection years after an incident, they *and* the plaintiffs get them—shows the sheer fantasy of the majority's contention that a qualified privilege will provide any protection. Such an approach

> frustrates the very purpose of the privilege by discouraging the communication of relevant information by employees of the client to attorneys seeking to render legal advice to the client corporation. The attorney's advice will also frequently be more significant to noncontrol group members than to those who officially sanction the advice, and the control group test makes it more difficult to convey full and frank legal advice to the employees who will put into effect the client corporation's policy. See, *e.g., Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146, 1164 (DSC 1974) ("Af-

ter the lawyer forms his or her opinion, it is of no immediate benefit to the Chairman of the Board or the President. It must be given to the corporate personnel who will apply it").

> The narrow scope given the attorney-client privilege ... not only makes it difficult for corporate attorneys to formulate sound advice when their client is faced with a specific legal problem but also threatens to limit the valuable efforts of corporate counsel to ensure their client's compliance with the law. In light of the vast and complicated array of regulatory legislation confronting the modern corporation, corporations, unlike most individuals, "constantly go to lawyers to find out how to obey the law."

*Upjohn,* 449 U.S. at 392, 101 S.Ct. at 684 (citation omitted).

Obviously a corporation is physically incapable of walking into an attorney's office to report facts and seek legal advice. When a corporation "speaks," it must do so through its officers and employees. Those individuals who make up the corporation and who do the work that affect people's lives must be able to talk candidly and confidentially with corporate counsel. As such, the qualified privilege established by the majority for non-control employees in a hospital setting will be particularly destructive as doctors, nurses, and scrub technicians—the people actually doing the work—by this decision will fall into the non-control category. The flow of information to and from these vital personnel will be affected as in-house investigations may be curtailed to avoid discovery by potential litigants.

The majority concludes that nurse Wilson's deposition, taken some two years and three months after the incident, was not sufficiently fact intensive. While failing to discuss other information sources or the lack of any complaint about information availability by plaintiff until the existence of the interview summaries was disclosed, the majority concludes that the lack of production deprives the plaintiff of "the truth." On the facts here, such a holding will allow plaintiff's lawyers, armed with "I

do not recall" answers, to obtain not only any lawyer's summaries of interviews but to depose him or her to determine if anyone said anything in the context of the privilege. The result will be that corporate counsel will discontinue investigating incidents that need investigation and the public will suffer. *Cf. Samaritan Health Servs., Inc. v. Superior Court,* 142 Ariz. 435, 690 P.2d 154 (App.1984) (The parties concede that after *Samaritan,* counsel discontinued the practice of showing witnesses' summaries of prior statements). The privilege is founded on the necessity that communications be free of even the "apprehension of disclosure." *Hunt v. Blackburn,* 128 U.S. 464, 470, 9 S.Ct. 125, 127, 32 L.Ed. 408 (1888). If an attorney cannot promise to maintain the confidentiality of his client's communications, the only advice he or she could provide to the client would be "Don't talk to me." *Southern Cal. Gas Co. v. Public Util. Comm'n,* 50 Cal.3d 31, 265 Cal.Rptr. 801, 803–04, 784 P.2d 1373, 1375–76 (1990).

In *Samaritan Health Services,* counsel sought to obtain interview summaries of employees of the hospital. The issues before the court were whether the attorney-client and work product privileges applied but were waived when the employees reviewed the interview summaries to refresh their recollections prior to giving testimony. In holding that a waiver had occurred, the court noted the existence of the attorney-client privilege.

> [W]e hold that by using the interview summaries to refresh the recollections of its employees, Samaritan waived, except as qualified hereafter, *the attorney-client ... privilege[ ] that initially attached to the interview summaries.*

*Samaritan Health Servs.,* 142 Ariz. at 438, 690 P.2d at 157 (emphasis added).

This court's holding in *Samaritan Health Services* acknowledged that the attorney-client privilege attaches to interview summaries. The *only* difference between the case here and *Samaritan Health Services* is that the attorney in *Samaritan Health Services* interviewed and drafted the summaries rather than a paralegal, and here the summaries were never used in a manner that waived the privilege. As held by the majority, and I agree. the use of a paralegal does not affect the attachment of the privilege.

The trial court and the majority also rely on a perceived hardship placed on plaintiff without the production of the interview summaries. In *Admiral Insurance Co. v. United States District Court,* 881 F.2d 1486 (9th Cir.1989), the court had before it an interlocutory review of a trial court's order requiring a party to produce written statements that ostensibly were covered by the attorney-client privilege. Like here, attorneys for the corporation had interviewed employees regarding the incident that gave rise to the litigation. The court rejected the plaintiffs' contention that their inability to obtain the information from another source entitled them to discovery of what otherwise would have been protected under the attorney-client privilege:

> *The attorney-client privilege, like all other evidentiary privileges, may obstruct a party's access to the truth.* Although it may be inequitable that information contained in privileged materials is available to only one side in a dispute, a determination that communications or materials are privileged is simply a choice to protect the communication and relationship against claims of competing interests. Any inequity in terms of access to information is the price the system pays to maintain the integrity of the privilege. *An unavailability exception is, therefore, inconsistent with the nature and purpose of the privilege.*

This conclusion is bolstered by the effect such an exception would necessarily have on the attorney-client privilege. An unavailability exception to the privilege would force counsel to warn their clients against communicating sensitive information for fear of subsequent forced disclosure. Here, but for the attorney-client privilege, [the corporation] might not have directed [its employee] to speak with counsel for fear of creating a transcribed statement for plaintiffs' benefit....

In ordering production of a privileged statement on the facts of plaintiffs' assertion that they could not otherwise obtain the information contained in the statement, *the district court confused the attorney-client privilege with the work-product rule....* Although the rule affords special protections for work-product that reveals an attorney's mental impressions and opinions, other work-product materials nonetheless may be ordered produced upon an adverse party's demonstration of substantial need or inability to obtain the equivalent without undue hardship. *See Upjohn*, 449 U.S. at 401, 101 S.Ct. at 688.

... Accordingly, when a party makes a substantial showing that he is unable through his efforts to obtain needed information, the balance of equities shifts in favor of disclosure of trial preparation materials.

*This rationale cannot logically be extended to support an unavailability exception to the attorney-client privilege. While the work-product rule protects a client's investment in his attorney's labor to prevent unfair exploitation, the [attorney-client] privilege protects communications between client and counsel to encourage the client to be forthcoming with his attorney so that appropriate legal advice can be offered. As Professor Saltzburg explained:*

> The principal difference between the attorney-client privilege and the work-product doctrine, in terms of the protections each provides, is that *the privilege cannot be overcome by a showing of need, whereas a showing of need may justify discovery of an attorney's work product.* Saltzburg, *Corporate and Related Attorney–Client Privilege: A Suggested Approach,* 12 Hofstra L.Rev. 279, 299 (1984).

*Id.* at 1494 (emphasis added) (footnote omitted). The holding in *Admiral Insurance* recently has been adopted by the Montana Supreme Court. "While recognizing that the privilege denies access to these communications, the [Admiral] court held that the legal system's need for the privilege out-weighs an asserted need for the information. We conclude that the reasoning of the Ninth Circuit in *Admiral Ins.* is *compelling and correct." State ex rel. United States Fidelity & Guaranty Co. v. Second Judicial Dist. Court,* 240 Mont. 5, 783 P.2d 911, 915 (1989) (emphasis added).

I find the reasoning of *Upjohn* and its progeny compelling, and I would grant relief on that basis.

Even if I were to agree with the majority and adopt a control group test as a defining factor in determining whether an attorney-client privilege exists, and further evaluate the application of the privilege under a substantial need *and* unavailability analysis, under the facts here I would still disagree with the majority's application of its own test.

The surgery and cardiac arrest occurred on February 2, 1988. Plaintiffs' counsel was retained early, and, in late March of 1988, demanded all the treatment and hospital records for the child. Suit was filed on September 20, 1988. The depositions of Miller, Gilboa, Wilson, and Covey were not taken until January 19, 1989, March 22, 1989, May 30, 1990, and June 11, 1990, respectively. Plaintiffs did not complain about the witnesses' failed recall until disclosure of the existence of the interview summaries.

The trial judge's order best outlines the problems.

> Where plaintiffs' opportunity to prove its case is as effectively blocked as defendants' theories would claim in the fourteen motions before this Court, *due process* would seem to call for some form of remedy. Rather than the drastic remedy of *a change in burden of proof,* this Court chooses to allow the discovery of the functional equivalent of important witness statements, in a case where there is *no other way for the evidence to be secured.*

(Emphasis added.)

First, the trial judge applied, without analysis or citation of authority, a due process evaluation. This, after conceding the application of the attorney-client privilege.

The majority declined to review the trial court's due process evaluation as "increased calcification ... would follow a ruling on constitutional grounds." How can the majority, using an attorney-client privilege analysis, say what the trial court did is correct when the trial judge decided the motion for protective order as a due process issue?

Next, the special action was filed initially by Samaritan, a non-party, based on the trial judge's refusal to grant its request for a protective order for the four interview summaries. The trial judge appears in his order to be weighing the options of "chang[ing] the burden of proof" versus ordering disclosure. What strikes me is that changing the burden of proof involves exclusively plaintiffs' negligent supervision claim against defendant Phoenix Children's Hospital. Whether the judge wants to shift the burden of proof on a negligent supervision claim against a defendant in the lawsuit should have nothing to do with an evaluation of whether Samaritan's communications with its employees enjoy attorney-client protection.

Also, the trial judge concludes that this is a case where *"there is no other way* for the evidence to be secured." (Emphasis added.) The plaintiffs have multiple sources of information. Taking judicial notice [22] of state court files (The Superior Court of the State of Arizona), it is clear that in addition to the subject nurses, there were at least eight other nurses or technicians and six doctors in and out of the operating room during this occurrence. The trial file in this action contains eighteen volumes of documents excluding discovery and transcripts. The record before the superior court indicates that the parties filed eighty-three notices of deposition; thirty-eight notices of deposition taken; nine notices of deposition with certificates of service; seven amended notices of deposition with certification of service; and, one amended notice of deposition. A lawyer at oral argument characterized the discovery record as containing "hundreds of pages" of depositions.

This is not a case where the majority can say, based on the record, that the defendant has all the facts and plaintiff has no means to develop them. The file before this court, like the trial court, contains only a fraction of the discovery. We do not have *one* complete deposition or any other written discovery. All this record contains are snapshots of depositions of the four nurses. It is impossible for the majority to have reviewed the unavailability element of its own test because we do not have the complete record. The trial judge also did not make this evaluation because the discovery material—depositions, written discovery—is not in the trial file.

The "evidence" alluded to by the trial court in the statement contending that there is "no other way" for it to be secured, is the interview summaries. The court, at the time it made this statement, could not have had any idea what the "evidence" was as the summaries were ordered to be produced for *in camera* inspection in the same order that contained the statement.

The majority concludes that the trial court was not "derelict in applying the substantial need and unavailability standards to the materials tendered for review." As seen by the trial court's own order, it did not apply that test and, it could not have because it could not compare interview summaries that it had not seen with discovery not available for it to read.

At a minimum, I would remand the matter to the trial court with instructions to determine the substantial need and unavailability issues *after* it has read the discovered material in the case. The majority's decision approves an evaluation that simply never took place.

The majority must make two assumptions to conclude that the plaintiff is deprived of the truth on this record. First,

---

**22.** The court of appeals may take judicial notice of state court files. *See* Morris K. Udall et al., *Arizona Practice: Law of Evidence* § 152, at 331 (3d ed. 1991).

that the record does not contain an adequate account of what transpired in the operating room.[23] Second, that the inadequacy is a result of some systemic conspiracy. The trial court accuses the petitioner of "send[ing] in [the] troops ..., and then all of a sudden everything is gone." The implication is that the entire hospital staff—the doctors, nurses, and technicians—are lying. From this record, I will not participate in such an implication.

If the majority does not believe that corporations can be trusted with a meaningful attorney-client privilege, they should say so and attempt to justify such a conclusion. The trial judge, unable to justify production when confronted with the attorney-client privilege, reached for the Due Process Clause. The majority, unable to justify a due process analysis, qualified the privilege. To first extol the benefits of the corporate privilege and then to say, *on this record*, that access to "the truth" requires a qualification, is simply manufactured.

As I disagree with the creation of the control versus non-control paradigm with an overlay of pliant terms such as "substantial need," I respectfully dissent.[24]

**23.** The majority criticizes my assumption that "in so intensely processed a case, equivalent information must be somehow available from some other source." Is my assumption somehow worse than the majority's that the information is not available in the volumes of discovery? My point is that neither the majority nor I should make any assumptions. The trial judge and the appellate court should read the entire record before coming to conclusions about what it contains. This is certainly not an unreasonable expectation.

**24.** The majority spends much time discussing Rule 26(b)(3), the work product privilege. The rule only allows discovery of material that is "otherwise discoverable." As the trial court did not base its decision on the work product privilege, and as I conclude that the material is not "otherwise discoverable" because of the application of the attorney-client privilege, I do not feel additional discussion of the issue is necessary. *Butler,* 112 Ariz. at 524, 544 P.2d at 206. ("[P]rivileged material is not discoverable.")